**UNITED STATES of America, Appellee,**

v.

**Michael NIXON, Defendant-Appellant.**

**No. 1259, Docket 85–1002.**

United States Court of Appeals, Second Circuit.

Argued June 13, 1985.

Decided Dec. 12, 1985.

Thomas H. Nooter, New York City, for defendant-appellant.

Charles E. Rose, Asst. U.S. Atty., E.D. N.Y. (Raymond J. Dearie, U.S. Atty., E.D. N.Y., Jane Simkin Smith, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before FRIENDLY, OAKES and WINTER, Circuit Judges.

WINTER, Circuit Judge.

Michael Nixon appeals from his conviction by a jury of conspiracy to possess with intent to distribute heroin, 21 U.S.C. § 846 (1982); aiding and abetting the importation of heroin into the United States, 21 U.S.C. §§ 952(a), 960(a)(1), 963 and 18 U.S.C. § 2; and aiding and abetting possession of heroin with the intent to distribute, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Nixon was sentenced to concurrent five-year prison terms on each count, and concurrent ten-year special parole terms on counts two and three.

Nixon argues on appeal that: (i) the period of time between his arraignment and trial was impermissibly long under the Speedy Trial Act, 18 U.S.C. §§ 3161–3174; (ii) his trial was prejudiced by erroneous statements by a government witness that Nixon had previously been in jail; and (iii) the trial court improperly admitted hearsay evidence. For the reasons stated below, we affirm.

## BACKGROUND

In May, 1984, Habib Makba, an informer for the United States Drug Enforcement Administration ("DEA") in Pakistan, was approached by Haqdad Khan, a Pakistani, about the possibility of importing two kilograms of heroin into the United States. Khan told Makba that the heroin was for two buyers in California and two days later identified these prospective buyers as Royal Franklin Gasso and Michael Nixon. Khan also gave Nixon's California phone number and address to Makba. Makba reported this information to DEA agents in Pakistan and agreed to carry the heroin to the United States as part of an undercover scheme.

Later in May, Makba received the two kilograms of heroin from Khan's brother. On June 17, he flew to New York and, after checking into a Holiday Inn, made several phone calls which were recorded by DEA agents. The first call was to Nixon who in turn gave Makba a number at which Khan, now in the United States, could be reached. Makba then arranged for Khan and Royal Gasso to come to New York to pick up the heroin.

Khan and Gasso took delivery of the heroin at a videotaped meeting in Makba's hotel room. They were subsequently arrested and agreed to cooperate with the government. Gasso and Khan, accompanied by DEA agents, flew to California via Denver in order to conduct a controlled delivery of the heroin to Nixon. Before and during the trip, Gasso made a series of calls to Nixon, also recorded. Nixon stated that he had made a plane reservation for Gasso in a fictitious name, and made statements that, by his own admission, "seem[ed] to indicate a knowledge concerning the purpose of Gasso's original trip to New York." Brief of Appellant at 6. After arriving in California, Gasso and the agents arranged to meet Nixon at a local restaurant. Nixon came to the restaurant but left when he saw Gasso in the company of others. He was arrested after he left the restaurant.

The period between Nixon's June, 1984 arrest and the beginning of his trial in October is the focal point of one of his claims on appeal. Nixon, Gasso and Khan were indicted on June 25, 1984. Nixon first appeared in court on July 6, 1984 but was unrepresented by counsel. A not guilty plea was entered on his behalf only on July 13, his first appearance with counsel.

At a July 27 conference on various pretrial motions, Nixon's attorney requested discovery of evidence in the government's possession and also expressed opposition to a government demand for Nixon's passport. At his request, the attorney was granted leave to submit a memorandum in opposition, with a subsequent opportunity for the government to respond. No papers were filed, however, and the passport was voluntarily turned over on August 9.

Also at the July 27 conference, Nixon's attorney indicated his intention to file a motion to take a foreign deposition. The court and the prosecutor pointed out that such a procedure would be time-consuming and involve the use of letters rogatory. Nixon's counsel persisted in his intention, however, and, as a consequence, the trial, which had been scheduled for August 13, was postponed.

On August 28 another conference was held. Defense counsel reaffirmed his intention to take a foreign deposition. A trial date of September 4 was then abandoned. Three days later, on August 31, defense counsel reversed his position, stating that he no longer planned to take the foreign deposition. He demanded an immediate trial. By then, however, the government had a problem getting witnesses to New York from Pakistan during the week of September 3. A trial date of September 10 was then set.

Nevertheless, trial did not begin on September 10. Co-defendant Gasso unexpectedly decided to go to trial and not to cooperate with the government. This reversal created several problems. Gasso's attorney was unavailable, first due to personal problems and later due to his appearance before the same judge in a different case. In order to accommodate both Gasso's counsel's and the court's scheduling conflicts, Gasso's trial was set for the week of October 22. Nixon moved on October 22 to dismiss his indictment because of a violation of the Speedy Trial Act. This motion was denied on the 23rd, and all parties agreed that the trial would be delayed until a new jury panel was available. Nixon's trial began on October 30.

On appeal, Nixon renews his claim that the period between his arraignment and trial violated his statutory right to a speedy trial. He also raises as error two incidents that took place at his trial. The first involved two statements by Makba on direct examination that Nixon had once been in jail in Pakistan on heroin-related charges. The other claim relates to a Telex introduced by the government on cross-examination of a defense witness, which the defense claims was improperly admitted hearsay evidence. We consider these issues seriatim.

## DISCUSSION

### 1. *The Speedy Trial Claim*

The Speedy Trial Act requires that a criminal defendant be brought to trial within seventy days of his indictment or "the date the defendant has appeared before a judicial officer," whichever is later. 18 U.S.C. § 3161(c)(1). The Act lists specified circumstances in which periods of time must be excluded from the running of the seventy-day speedy trial "clock." § 3161(h)(1)–(9). If the seventy-day limit is exceeded, the trial court is required to dismiss the indictment, with or without prejudice in the court's discretion. § 3162(a)(2).

### A. The Starting of the Speedy Trial Clock

Nixon first appeared in court on July 6 but was not represented by counsel and thus did not enter a plea. He first appeared with counsel on July 13, at which time he pleaded not guilty. Appellant argues, based on the "appeared before a judi-

cial officer" language of § 3161(c)(1), that the July 6 appearance started the speedy trial clock.

■ An examination of the relevant legislative history reveals that the statutory period was intended to begin only after an appearance at which a not guilty plea has been entered. Congress believed it would be wasteful to require the government to begin planning for trial when it was still possible that a defendant might plead guilty or *nolo contendere*. As the House Report stated,

> After arraignment, a defendant is required to be brought to trial within 60 days at a place within the district set by the court. This language was substituted for that of the original Senate provision, again at the request of the Justice Department. The purpose of the amendment is to begin the running of the time limits from a logical point in the proceedings. At [arraignment], the defendant is required to plead to the charge contained in an information or indictment. The Department pointed out that it would be a waste of judicial resources to require the courts to schedule trials at the time of the filing of an indictment, due to the possibility that the defendant may choose to plead either guilty or *nolo contendere*, thus making trial unnecessary. The Committee believes that this provision is more consistent with the goals of Section 3161(a), which requires the court to set trial for either a day certain or on a weekly or other short-term calendar. The scheduling of trials for defendants who will ultimately plead guilty only serves to make more difficult the scheduling of trials for those who will demand them.

H.R.Rep. No. 1508, 93d Cong., 2d Sess. 30, *reprinted in* 1974 U.S.Code Cong. & Ad. News 7401, 7423. Moreover, the statute expressly applies only to cases in which pleas of not guilty have been entered. *See* 18 U.S.C. § 3161(c)(1). It is evident, therefore, that the July 13 plea started the Speedy Trial Act clock in this case. Because the day after the triggering event is

the first day to be counted, *United States v. Simmons*, 763 F.2d 529, 530 n. 1 (2d Cir.1985), the clock started on July 14.

Nixon's trial began on October 30. Thus, the relevant period for computation of the seventy-day limit is July 14–October 29, a total of 108 days. We must therefore consider which periods are excludable from the speedy trial clock.

### B. Uncontested Excludable Periods

Nixon concedes the excludability of certain time periods. First, he concedes that July 27, the date on which pretrial motions were filed and decided, is excludable as a "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). Nixon also concedes that the period from September 10–14 is excludable. During this period co-defendant Gasso's counsel was unavailable due to an illness in his family, and delay attributable to a co-defendant is excludable speedy trial time as to all defendants. *United States v. Piteo*, 726 F.2d 50, 52 (2d Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1682, 80 L.Ed.2d 156 (1984); *United States v. Barton*, 647 F.2d 224, 229 n. 5 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Finally, Nixon also concedes that the period from October 24–29 was properly excluded. The parties agreed to postpone the trial during this time so that a new jury panel would be available.

These uncontested periods total twelve days, reducing the relevant pretrial period to 96 days, virtually all of which is contested. We now consider certain time periods that are excludable and quantitatively sufficient to dispose of the issue.

### C. July 28-August 10

■ At the July 27 pretrial motions hearing, the government made an oral motion for surrender of Nixon's passport. Oral pretrial motions made on the record are considered motions for purposes of § 3161(h)(1)(F). *United States v. Cobb*,

697 F.2d 38, 43 (2d Cir.1982). Nixon's counsel opposed this motion and was granted permission to file a brief on the issue. Had the filing schedule been followed, briefing would have been concluded by August 10. This "reasonably expeditious" period would then have been excludable under § 3161(h)(1)(F). *Simmons*, 763 F.2d at 532. However, no papers were filed and Nixon surrendered his passport on August 9. The government argues that the fact of voluntary compliance does not alter the excludability of the period from July 28-August 9 because defense counsel never notified the court of his change of position.

In *United States v. Bufalino*, 683 F.2d 639 (2d Cir.1982), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983), we held excludable a lengthy period during which defendant had not responded to a government motion to sequester a jury. The court noted that, given the volume of the criminal caseload, defendants must make their positions known to the court for scheduling purposes. The court concluded that it would be unfair for Bufalino to "stand by" without notifying the court of his position and then "reap the benefit of inaction" by having the period counted against the speedy trial clock. *Bufalino*, 683 F.2d at 645-46. In this case, we believe it would be equally unfair, given Nixon's failure to notify the court of his changed position, for him to benefit retroactively from the voluntary surrender of his passport. Thus, we hold excludable the thirteen days between July 28 and August 9.

### D. August 27-September 9

■ On August 27, defense counsel renewed, and the trial judge granted, a motion to compel disclosure of discovery materials. This day is excludable under § 3161(h)(1)(F).

■ Following pretrial conferences on August 28 and 31, the judge rescheduled the trial for September 10 and entered an order excluding the eleven days from August 31 to September 10. The parties agree that September 10 must be excluded

and we consider only the period through September 9. According to the record, the judge entered the order of excludable delay pursuant to the motions section, § 3161(h)(1)(F). Although we are not convinced that this was the most appropriate section under which to exclude these particular days, we believe there is ample basis in the record for excluding them and the period from August 28-August 30 as well.

At the July 27 conference, Nixon's counsel announced his intention to take a foreign deposition, and the judge stated on the record that he assumed that there was no rush in getting to trial in light of this request. The trial date of August 13 was then postponed. Defense counsel registered no disagreement. At the August 28 conference, Nixon's local counsel (trial counsel being in Japan) reiterated the defense's intention to take a foreign deposition. In response, the judge stated, "So, we'll not get to the trial on Tuesday [September 4]." Nixon's counsel responded, "I don't think so," adding that he might also want to follow up on information soon to be provided by the government. The judge then directed Nixon's counsel to make the necessary motions for the taking of the foreign deposition and stated that another conference would occur on Friday, August 31.

On that date, Nixon's counsel reversed his position, abandoned the plan to take a foreign deposition, and instead demanded a speedy trial. Although he blamed the delay on the government's failure to comply with discovery requests, the court found that it was attributable to defense tactics. The court stated: "[T]he delay has been caused by your co-counsel out in California who insisted he was going to [Germany] to take a deposition." The government attorney, who had earlier informed the court and defense counsel that he would need advance notice of any change in trial dates due to problems in arranging travel accommodations for certain witnesses, indicated that he would have problems getting his witnesses from Pakistan if trial were moved to later in the week of September 3;

therefore, the 10th was chosen as the new trial date.

The propriety of excluding the period August 28–30 is clear in light of the defense's conduct regarding the foreign deposition. Defense counsel had been on record for more than a month as planning to take that deposition, and the trial date of August 13 had been postponed accordingly. Had defense counsel not reaffirmed the intention to take a foreign deposition at the August 28 conference and agreed that the imminent trial date was therefore inappropriate, trial would have commenced on September 4. Nixon now argues that delays in discovery caused by the government were the cause of the postponement. However, the district court explicitly stated that the September 4 date was abandoned because of the proposed foreign deposition, and defense counsel himself declared his readiness to proceed as of August 31. Defense counsel was fully aware on August 28 that the district court was postponing the September 4 trial date as a result of his representations about the foreign depositions. Appellant may not now profit from the district court's amenability to giving the defense time to prepare its case. We believe this to be an even stronger case for excludability than *Bufalino,* in light of the fact that the delay in the instant case was the consequence of what was essentially an explicit request by the defense, whereas *Bufalino* merely involved silence.

■ We believe the judge was also correct in excluding the period from September 1–9. Because of the unavailability of the Pakistani witnesses resulting from defense counsel's earlier announced unreadiness to go to trial on September 4, this period was excludable under § 3161(h)(3)(A), which excludes delay due to "the absence or unavailability of the

defendant or an essential witness." 18 U.S.C. § 3161(h)(3)(A).[1]

### E. October 22–23

■ On October 22, Nixon moved to dismiss his indictment because of a Speedy Trial Act violation. On October 23, the court heard argument on and denied this motion.[2] These two days are thus excludable under § 3161(h)(1)(F).

### F. Conclusion

Appellant contests the excludability of several other periods, particularly the time from September 14 to October 22. In light of the foregoing determinations, however, consideration of these arguments is unnecessary. The excludable time totals 41 days, meaning that appellant was brought to trial at worst within 67 days after the start of the speedy trial clock.

### 2. *The Pakistani Jail Statement*

■ Nixon also claims that he was prejudiced by an erroneous statement made during the testimony of Habib Makba. With the aid of an interpreter, Makba testified about his own undercover involvement in the heroin scheme, both in Pakistan and the United States. Early in his testimony Makba said he had heard that Royal Gasso and Michael Nixon had been arrested for heroin smuggling and had met while in jail in Pakistan. This testimony came as a surprise to all parties and apparently was incorrect. After Nixon's counsel objected to the admission of this testimony, the government suggested an instruction to disregard, and Nixon's counsel moved for a mistrial. The motion for a mistrial was denied, and instead the judge instructed the jury to disregard completely the testimony:

> Ladies and gentlemen of the jury, you will disregard, strike from your minds

---

1. According to § 3161(h)(3)(B), an essential witness is unavailable "whenever his whereabouts are known but his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial."

2. In denying the motion to dismiss, the court entered a finding that the period from September 14 to October 22 was excludable "in the interests of justice." 18 U.S.C. § 3161(h)(8)(A). This determination is ineffective in light of our decision in *United States v. Tunnessen,* 763 F.2d 74 (2d Cir.1985), which holds that to be effective such findings must be contemporaneous with the delay.

entirely any testimony of this witness with respect to any arrest of Mr. Nixon. You will strike that from your minds as though the testimony had never been presented.

Shortly thereafter, Makba, who was having trouble understanding English, repeated the statement about Nixon having been in jail, and the judge again instructed the jury to disregard it. On appeal, Nixon contends that the cautionary instructions were inadequate and that his convictions must be reversed because of the prejudicial effect of those statements. The sole issue before us, therefore, is whether that instruction was sufficient to obviate any prejudice to Nixon.

The conduct of the trial would have been improved had these statements not been made, and the cautionary instruction might well have noted the apparent lack of any basis in fact for the statements, even though Nixon made no request for such an observation. Nevertheless, we believe that Nixon was adequately protected by the instruction given. The practice of instructing a jury to disregard improper testimony is necessary and well established. *See United States v. Bynum*, 485 F.2d 490, 503 (2d Cir.1973), *vacated and remanded on other grounds*, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 *modified*, 386 F.Supp. 449 (1974), *aff'd*, 513 F.2d 533, *cert. denied*, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975); *United States v. Burton*, 525 F.2d 17, 19–20 (2d Cir.1975); *United States v. Bell*, 500 F.2d 1287, 1289 (2d Cir.1974). Trials cannot be conducted like motion picture productions in which scenes are rerun until done perfectly, and all mistakes are left on the cutting room floor.

The cases most heavily relied upon by Nixon involved instructions to consider potentially prejudicial evidence for one purpose while disregarding it for other purposes. *See, e.g., Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968) (holding unconstitutional the practice of admitting confession of one co-defendant while instructing jury to disregard incriminating implications as to

other co-defendant; instruction insufficient to prevent prejudice). Here, however, the jury was told to disregard and to strike from their minds any testimony about an arrest of Nixon and were thus not required to engage in any "mental gymnastics," *see Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir.), *cert. denied*, 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945 (1932), such as considering evidence for one purpose but not another. This case is readily distinguishable from *United States v. Puco*, 453 F.2d 539 (2d Cir.1971), upon which Nixon also heavily relies, where the court found that the minimal probative value of the evidence of the defendant's 21-year-old narcotics conviction, repeatedly emphasized by the prosecution throughout the trial, in impeaching the defendant's credibility was so far outweighed by its prejudicial effect in his trial for a similar offense that its admission by the trial court over the defendant's pretrial objection warranted reversal.

Further, there is no suggestion that the government was even aware of Makba's erroneous belief, much less that it was deliberately elicited. The statement was primarily attributable to the difficulty Makba was having understanding English. We therefore hold that the court's instruction was sufficient to remedy any prejudice that may have occurred.

### 3. Introduction of the Telex Containing Makba's Prior Statements

As part of the defense case, Harlan Bowe, a DEA agent in Pakistan, was called in the hope of discrediting Makba's trial testimony. Makba had provided one description of a "Michael" to Bowe, while one Chaman, an employee or "subsource" of Makba's, had given a different one. The defense thus hoped to suggest to the jury that the DEA had gone after the wrong "Michael."

On cross-examination, the government sought to refute the suggestion that the DEA had pursued the wrong Michael. To that end, it offered as evidence a telex from a DEA agent in Pakistan named McCarthy. The telex was based on infor-

mation McCarthy had received from Makba and contained Nixon's address and telephone number. When the defense objected to the introduction of this evidence as inadmissible hearsay, the prosecutor argued that it was admissible as a prior consistent statement to refute the attack on Makba's credibility. The telex was admitted with an instruction that the testimony was not "being received for the truth of the matters contained therein."

Appellant contends that the telex was erroneously admitted as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B). The government now asserts, contrary to its position at trial, that the telex was offered under the rule of completeness, see Fed.R.Evid. 106, in order to explain the apparent inconsistency that had been established during Bowe's direct examination. We do not consider this issue, however, for even if the telex might be admitted under the rule of completeness, it should have been offered through McCarthy, not Bowe. The telex reported statements supposedly made by Makba to Agent McCarthy. Because McCarthy did not testify, there was no proof other than the hearsay telex itself that Makba ever reported to McCarthy the information contained therein about Nixon. It is surely outside the hearsay exception for public reports, Fed.R.Evid. 803(8)(B), which excludes "in criminal cases matters observed by police officers and other law enforcement personnel."

Debate exists over whether a public report inadmissible under Rule 803(8) is nonetheless admissible under one of the other hearsay exceptions. Compare United States v. Oates, 560 F.2d 45, 77 (2d Cir. 1977) (stating in dicta that law enforcement reports inadmissible under Rule 803(8) may not be admitted under any other hearsay exception); United States v. Quinto, 582 F.2d 224, 235 (2d Cir.1978) (following Oates dicta); United States v. Ruffin, 575 F.2d 346, 356 (2d Cir.1978) (same) with United States v. Yakobov, 712 F.2d 20, 25–26 (2d Cir.1983) (disregarding Oates dicta and admitting evidence under Rule 803(10) as to absence of public record); United States v. Sawyer, 607 F.2d 1190, 1193 (7th Cir.1979)

(refusing to follow Oates; admitting IRS agent's report of phone call under Rule 803(5)), cert. denied, 445 U.S. 943, 100 S.Ct. 1338, 63 L.Ed.2d 776 (1980).

We need not enter this debate because the telex was not admissible under any other hearsay exception. Resort to the business records exception, Fed.R.Evid. 803(6), is not possible in light of the prosecutor's statements at trial that telexes of this sort are not business records and contain many inaccuracies. Further, any attempt to bring the telex within the catch-all exception, Fed.R.Evid. 803(24), must fail for lack of specific findings on the record that it was being received under that exception. See 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(24)[01], at 803–373 (specific findings should be entered on the record "unless there is a waiver explicitly, or by silence, or the basis for the ruling is obvious"). Thus, we conclude that the telex was inadmissible hearsay.

■ However, no prejudice resulted from admission of the telex. Although it refuted the contention that the DEA had accidently pursued the wrong Michael, it was at worst cumulative and far less damaging than the admissible evidence introduced on the same issue. In view of Makba's unchallenged testimony that Khan had instructed him to phone a certain number after arriving with the heroin in New York, and that, when he dialed the number, he actually spoke to someone later identified as Nixon who then gave him Khan's number in this country, the telex in question was utterly harmless.

Affirmed.

OAKES, Circuit Judge (concurring).

I agree with Judge Winter's opinion and each of its holdings. I write only to say that most of the laborious work Judge Winter and the other two members of this panel were put to on the speedy trial point could have been avoided if the district judge who had the case until visiting Judge Maletz took over the case on September 14, 1984, had seen fit to follow the Eastern

District Speedy Trial Plan and to utilize the form provided thereunder to make an on-the-spot determination of excludable periods of time. Another time and I, for one, would remand for appropriate findings under *United States v. Simmons,* 763 F.2d 529, 531–32 (2d Cir.1985).