# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 9, 2007　　　　　Decided August 14, 2007

No. 05-3125

UNITED STATES OF AMERICA,
APPELLEE

v.

THOMAS TAYLOR,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00217-01)

*Richard Seligman*, appointed by the court, argued the cause and filed the briefs for appellant.

*Robert E. Leidenheimer, Jr.*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, Assistant U.S. Attorney.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS.

BROWN, *Circuit Judge*: Appellant Thomas Taylor challenges his 18 U.S.C. § 922(g)(1) conviction, arguing that the charge should have been dismissed on statutory and constitutional speedy trial grounds and that in any case his trial was contaminated by improperly admitted evidence. For reasons detailed below, we reject his contentions and affirm his conviction.

I

On March 6, 2003, shortly before 9:00 A.M., a warrant squad from the U.S. Marshals Service went to 722 Quincy Street, N.W., to execute a parole warrant for Mr. Taylor. The officers knocked on the door, and the appellant's grandmother, Mildred Alice Taylor, answered. Deputy Bob Haufmaster[1] said, "Thomas Taylor." Mrs. Taylor, who owned the house, responded "yes" and stepped aside, whereupon the officers entered. When they again asked for the appellant, Mrs. Taylor directed them downstairs.

While two of the officers remained with Mrs. Taylor, the rest proceeded downstairs to search. Deputy Andrew Fang lifted a blanket that covered a bed and peered underneath to see if Mr. Taylor was hiding there. Instead of a person, he found what he instantly recognized as a gun case.

The team eventually located the appellant in the basement bathroom and arrested him. Deputy Fang then extracted the case from beneath the bed and opened it, confirming it contained a loaded gun.

---

[1] Several variations of the deputy's name appear in the record. He is variously called Hoffmaster, Hoffman, and Haufmaster.

Shortly thereafter, Agent Jeffrey Meixner from the Bureau of Alcohol, Tobacco, Firearms and Explosives came to 722 Quincy Street to collect the gun. Mrs. Taylor gave him permission to look around. While downstairs, he noticed an ID and a checkbook sitting in plain view on a nightstand by the bed. He took custody of those materials and of the weapon.

Mr. Taylor was arrested for parole violation. Two months later, on May 27, 2003, he was indicted for possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). For reasons not relevant to our disposition, but apparently based at least in part on governmental negligence, Mr. Taylor was not arraigned until March 5, 2004. At that time, Mr. Taylor, through his attorney, orally moved for dismissal based on the delay.

This motion to dismiss was reduced to writing on May 3, 2004, and filed in conjunction with a motion to suppress the gun. Mr. Taylor argued the Speedy Trial Act—specifically 18 U.S.C. § 3161(b) and (j)—required dismissal. The court took both motions under advisement on May 12 when the government submitted oppositions. The court denied the dismissal motion orally on August 5, and denied the suppression motion in writing the following day.

Meanwhile, the trial was scheduled to begin May 20 but was delayed. Mr. Taylor offered on May 20 to "waive his right to a speedy trial up until August 18th." Eventually the trial was rescheduled for August 10. That morning, Mr. Taylor moved for reconsideration of the order denying suppression, and the court denied the motion. The trial then began at last, and the jury convicted Mr. Taylor two days later, on August 12.

4

II

We consider first Mr. Taylor's argument that his interest in a speedy trial requires dismissal of the charges against him, addressing his statutory and constitutional arguments in turn.

A

Before the district court, Mr. Taylor moved to dismiss based on 18 U.S.C. § 3161(b), which limits the time between arrest and indictment.[2] Mr. Taylor has however not renewed this argument before us, and we treat it as abandoned. Instead, he now seeks dismissal based on § 3161(c)(1), which requires a criminal defendant's trial to begin "within seventy days from the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."

As Mr. Taylor did not make this argument below, we review the district court's decision not to dismiss (sua sponte) on § 3161(c)(1) grounds for plain error only. *See Johnson v. United States*, 520 U.S. 461, 464 (1997) (citing FED. R. CRIM. P. 52(b)).[3] Under that standard of review, we will correct a district

_____

[2] Mr. Taylor's motion to dismiss also cited 18 U.S.C. § 3161(j), violation of which results in sanctions but not dismissal. *See id.* § 3162(b). He has not pursued this argument on appeal.

[3] Arguments could be made for both higher and lower levels of deference. On one side, Mr. Taylor requests *de novo* review, citing *Zedner v. United States*, 126 S. Ct. 1976 (2006). But to the extent *Zedner* can be read to establish that Speedy Trial Act violations automatically affect substantial rights, this rule applies only to failure by a district court to make explicit findings as required by 18 U.S.C. § 3161(h)(8), a provision not at issue in this case. *See Zedner*, 126 S. Ct. at 1989–90. At the other extreme, under § 3162(a)(2), a defendant's failure to "move for dismissal prior to trial" constitutes

court's error only if (1) there is in fact an error to correct; (2) the error is "plain"; (3) it "affects substantial rights"; and (4) it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 466–67 (alterations and internal quotation marks omitted).

The Speedy Trial Act excludes certain periods from its seventy-day clock, two of which are important here. First, we exclude any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). If no hearing is held, this exclusion runs through "the day the court receives all the papers it reasonably expects to help it decide the motion." *United States v. Saro*, 24 F.3d 283, 292 (D.C. Cir. 1994) (internal quotation marks omitted). Second, once that period expires, we exclude "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(J).

Mr. Taylor was indicted on May 27, 2003, but did not make his first appearance before the court until March 5, 2004. The Speedy Trial Act clock would normally start with that latter date, but at that appearance Mr. Taylor entered an oral motion to dismiss. We now join several of our sister circuits in holding that exclusion under § 3161(h)(1)(F) is triggered by written and oral motions alike. *Accord, e.g.*, *United States v. Broadwater*, 151 F.3d 1359, 1361 (11th Cir. 1998) (per curiam); *United States v. Rodriguez*, 63 F.3d 1159, 1164–65 (1st Cir. 1995);

---

waiver of § 3161(c) claims. It is unclear whether Mr. Taylor's motion to dismiss based on a separate provision suffices to avoid waiver. In the end, however, all roads lead to Rome: As we find no error, much less a plain error, we would affirm regardless of how we read *Zedner* and § 3162.

*United States v. Moses*, 15 F.3d 774, 776 n.3 (8th Cir. 1994); *United States v. Nixon*, 779 F.2d 126, 130–31 (2d Cir. 1985). Thus, we exclude March 5 through May 12, when the final papers related to Mr. Taylor's motions to dismiss and to suppress were filed. We then exclude the next thirty days, through June 11, based on § 3161(h)(1)(J). Under *Zedner v. United States*, 126 S. Ct. 1976, 1985 (2006), Mr. Taylor's attempted prospective waiver of his Speedy Trial Act rights on May 20 had no effect. Therefore, we begin counting on June 12 and continue counting through August 10, the day the trial began. *See United States v. Harris*, No. 05-3026, slip op. at 5 n.1 (D.C. Cir. June 22, 2007) ("[A] logical consequence of not counting the date of indictment toward the seventy-day total is that we must count the date of trial . . . .").[4] That comes to sixty days, well within § 3161(c)(1)'s seventy-day limit. Hence, there was no Speedy Trial Act violation, and we deny Mr. Taylor's request that we remand with instructions to dismiss on this ground.

---

[4] The government would have us exclude August 10 based on the motion for reconsideration Mr. Taylor entered that day. Such an approach would effectively extend the § 3161(c)(1) limit from seventy days to seventy-one. Suppose, for instance, a defendant is arraigned on March 1, so that trial must begin no later than May 10, seventy days later. Trial is instead scheduled for May 11, one day late. Prior to May 11, there is no violation. Under the government's proposed rule, if the defendant moves for dismissal on May 11 on speedy trial grounds, this excludes May 11 from the count, so that paradoxically the trial is now timely; conversely, if the defendant does *not* so move, then the seventy-day limit is waived under § 3162(a)(2). Thus, the defendant has no way to vindicate the Speedy Trial Act guarantee of trial within seventy days. In order to avoid a result clearly at odds with the statute, we must ignore pretrial motions filed on the day of the trial for Speedy Trial Act purposes; equivalently, we deem the Act violated when dawn breaks on the seventy-first day without a trial, regardless of what happens later that day.

B

In the alternative, Mr. Taylor seeks dismissal of the charge against him based on the Speedy Trial Clause of the Constitution. *See* U.S. CONST. amend. VI. We review claimed violations based on "four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992).

As *Doggett* explained, "[s]imply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Id.* at 651–52. Moreover, "as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the [constitutional] enquiry." *Id.* at 652 n.1. "Depending on the nature of the charges," the Court noted, "the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Id.*

Here, the entire delay between indictment and trial barely exceeded one year. Assuming this is sufficient to trigger the *Doggett* inquiry, we must next "consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* at 652. This is because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.* In this case, because the delay only just exceeded that bare minimum, the presumption has not "intensifie[d]" at all. Nor has Mr. Taylor been able to establish any actual prejudice, which the

Court identified as including "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Id.* at 654 (alteration in original) (internal quotation marks omitted). Because "presumptive prejudice cannot alone carry a Sixth Amendment claim," *id.* at 656, particularly in the weak form presented here, Mr. Taylor's claim fails.

III

Having determined dismissal is not required, we turn to Mr. Taylor's evidentiary arguments. He maintains the officers violated his Fourth Amendment rights by entering 722 Quincy Street without a reasonable belief he lived there and was present; exceeded the permissible scope of their search by looking under his bed; improperly opened the gun case without first obtaining a warrant; and seized various identifying materials without a warrant.

Deputy Fang testified that fugitives had been known to hollow out bedsprings as hiding places; thus, assuming the officers could enter the house, looking under the bed represented no violation, despite the fact Mr. Taylor would not have fit under the bed absent such modifications. *See Maryland v. Buie*, 494 U.S. 325, 332–33 (1990). Also, Agent Meixner received permission from Mrs. Taylor to look around, and the ID and checkbook he seized were in plain view; therefore, absent antecedent violations, seizure of those items was proper even if we assume Mr. Taylor did not waive this argument. *See* FED. R. CRIM. P. 12(e) (waiver); *Horton v. California*, 496 U.S. 128, 134–37 (1990) (plain view); *United States v. Matlock*, 415 U.S. 164, 169–71 (1974) (consent). We now address Mr. Taylor's two remaining evidentiary arguments in greater detail.

A

Since the parole warrant contained no information regarding his residence, Mr. Taylor argues the officers had no reason to believe he was at 722 Quincy Street and hence no authority to enter. *See Payton v. New York,* 445 U.S. 573, 603 (1980). Other documents, such as Mr. Taylor's inmate record, do show the 722 Quincy Street address, but there is no evidence anyone in the warrant squad saw those documents.

Undoubtedly, this lacuna in the evidentiary record could easily have been filled. Mr. Taylor was a parolee. His parole agreement necessarily contained a current address, and his parole agent must have known where to find him. Officers executing an arrest warrant may enter a dwelling given "reasonable belief" that the suspect lives there and is present at the time. *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005). In *Thomas*, we upheld a search despite "the absence of testimony about where the marshals got Thomas' address," as (1) Thomas was a parolee, required to keep his current address on file, and (2) one of the warrant officers testified Thomas's address had been ascertained after an "investigation." *Id.* Crucially, we took the term "investigation" to indicate "'a systematic official inquiry'" as opposed to "a mere hunch, surmise, or suspicion." *Id.* (internal quotation marks omitted).

But here the government failed to comply even with *Thomas*'s modest requirements. With the record devoid of proof the warrant squad arrived at 722 Quincy Street with the requisite reasonable belief, the search was improper unless some additional information gathered at the scene, prior to the officers' entry into the house, supported such a reasonable belief. Specifically, the question is whether the terse exchange between Deputy Haufmaster and Mrs. Taylor provided sufficient reason

to believe Mr. Taylor lived at 722 Quincy Street and was currently present.

The colloquy at the door makes Marshal Will Kane from "High Noon" seem garrulous. (Deputy Haufmaster: "Thomas Taylor." Mrs. Taylor: "Yes." Curtain.) Nevertheless, it is clear this brief dialogue satisfied the *Payton* standard. Mrs. Taylor recognized the men at her front door as law enforcement officers. Mot. Hr'g Tr. 6:13–16, May 12, 2004. At least one, she says, flashed his badge. *Id.* at 3:18–19. She interpreted the words, "Thomas Taylor," as an interrogative: Is Thomas Taylor here? She replied affirmatively.[5] After the officers entered, Deputy Haufmaster repeated, "Thomas Taylor," which Mrs. Taylor again took as a query: Where is Thomas Taylor? She responded, "He's in the basement."

This is sufficient for *Payton* and *Thomas*. Mrs. Taylor's initial response supported a reasonable belief that Thomas Taylor lived in the house, and the early hour alone sufficed to suggest he would be present, *see Thomas*, 429 F.3d at 286 (citing *United States v. May*, 68 F.3d 515, 516 (D.C. Cir. 1995), and *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983)). As it happened, Mrs. Taylor's subsequent comment that the appellant was in the basement reinforced the officers' already reasonable belief that he was present.

Undaunted, the appellant argues his case should really be controlled by *Steagald v. United States,* 451 U.S. 204 (1981). But *Steagald* is doubly inapposite. First, in that case, officers searched Steagald's home based on an arrest warrant for a separate person, Ricky Lyons. *Id.* at 206. By contrast, here the police looked for Mr. Taylor in his own home, and an arrest

---

[5] During her testimony at trial, Mrs. Taylor confessed she had had an "idea" why the officers had come to her house: Thomas had violated his parole. Trial Tr. 48:25 to 49:9, Aug. 10, 2004 (P.M.).

warrant alone is sufficient to authorize the entry into a person's home to effect his arrest. *Id.* at 214 n.7 (quoting *Payton*, 445 U.S. at 602–03). Second, *Steagald* involved the Fourth Amendment rights of a third-party homeowner, not those of the subject of the arrest warrant. *Id.* at 212. Therefore, even if we treat Mrs. Taylor as the sole resident of 722 Quincy Street, *Steagald* limits the evidence that could be used against *her*, but not the evidence that can be used against the appellant. *See United States v. Payner*, 447 U.S. 727, 731–33 (1980).

Thus, Mr. Taylor's argument on this point fails, and we affirm the district court's ruling: As Deputy Haufmaster's exchange with Mrs. Taylor at the threshold of the house supported a reasonable belief that Mr. Taylor lived at 722 Quincy Street and was present at the time, the officers' entry was proper.

## B

In light of our holdings above, the warrant squad properly entered 722 Quincy Street, lifted the blanket, and seized the gun case, which was by then in plain view. But Mr. Taylor then argues Deputy Fang violated his Fourth Amendment rights by opening the case without a warrant or any valid exception to the warrant requirement.

Indeed, as a rule, even when officers may lawfully *seize* a package, they must obtain a warrant before examining its contents. *See, e.g.*, *Horton*, 496 U.S. at 141 n.11; *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). However, the Supreme Court has suggested an important exception:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a

kit of burglar tools or a *gun case*) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.

*Arkansas v. Sanders*, 442 U.S. 753, 764–65 n.13 (1979) (dictum) (emphasis added).

*Sanders* decided which of two principles took precedence: the requirement that officers obtain a warrant before opening a package, as described in *United States v. Chadwick*, 433 U.S. 1 (1977), or the "automobile exception" to the warrant requirement, as described in *Carroll v. United States*, 267 U.S. 132 (1925). In the footnote quoted above, the *Sanders* majority suggested that with some packages, the precedence question would be moot, as there would be no reasonable expectation of privacy as to the contents in the first place. Addressing only those packages that sufficiently concealed their contents, *Sanders* held that the *Chadwick* rule took precedence. The Court later reversed course in *California v. Acevedo*, overturning *Sanders* with regard to the precedence order of the two rules, but *Acevedo* did not address the footnote's proposed exception. 500 U.S. 565, 579 (1991).

This court, sitting en banc, adopted the *Sanders* dictum as the law of the circuit in *United States v. Ross*, 655 F.2d 1159 (D.C. Cir. 1981) (*Ross I*). That case asked whether, under *Sanders*, the "luggage rule" took precedence over the automobile exception only for large, durable containers, or for all containers, including paper bags. The majority held that the "unworthy container" doctrine was unworkable, and that the *Sanders* dictum "indicated when the nature of the container would justify immediate search." *Id.* at 1170. Thus, under *Ross I*, the privacy interest inherent in any closed container that did

not satisfy the *Sanders* dictum would take precedence over the automobile exception.

Foreshadowing *Acevedo*, the Supreme Court overturned *Ross I*, holding that where an officer has probable cause to search a closed container in an automobile, the officer may open the container even without a warrant. *United States v. Ross*, 456 U.S. 798, 823 (1982) (*Ross II*). However, *Ross II* in no way undercut the *Sanders* dictum; indeed, the Court recited that rule in a footnote, *id.* at 814 n.19, and based much of its analysis on the plurality opinion in *Robbins v. California*, which was limited to "container[s] that conceal[ their] contents from plain view," *id.* at 822–23 (citing *Robbins*, 453 U.S. 420, 427 (1981) (plurality opinion)).

Thus, the *Sanders* exception remains the law in this circuit, *Ross II* notwithstanding. We accordingly reaffirm that gun cases and similar containers support no reasonable expectation of privacy if their contents can be inferred from their outward appearance. Applying this rule, we reject Mr. Taylor's argument regarding the gun case and hence affirm the district court's order denying his motion to suppress the gun.

## IV

For the reasons described above, the district court's denial of Mr. Taylor's motions to dismiss and to suppress, as well as Mr. Taylor's conviction, are

*Affirmed.*

WILLIAMS, *Senior Circuit Judge*, concurring: With respect to part III.B of the court's opinion, I find the discussion of which rule takes "precedence" confusing, but we all agree that under the controlling cases the officers had probable cause to search and seize the gun case because, given the message sent by its exterior, it was contraband in plain view.