[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12285

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 6, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-00028-CR-RWS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AZIM WALEED EPPS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 6, 2010)

Before DUBINA, Chief Judge, PRYOR and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

Azim Waleed Epps ("Mr. Epps") appeals his convictions and sentence for

armed bank robbery in violation of 18 U.S.C. § 2113(a), (d), and carrying a firearm

in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). He contends that the district court erred in denying his motion to suppress evidence and also that the government improperly vouched for a witness's credibility during closing argument.[1] After reading the parties' briefs, reviewing the record, and having the benefit of oral argument, we affirm.

## I.

On August 11, 2006, an African-American man with dreadlocks entered the Gainesville Bank and Trust. He approached a teller and said, "This is a robbery, give me your money." As the teller was gathering the money, he told her to hurry up and not to make him pull his gun. Both the first teller and an adjacent teller gave the robber money and dye packs, which he placed into a black bag.

In a parking lot near the bank, a woman was approaching her car. An African-American man with braided hair demanded her car keys, whereupon she hit him with the magazine she had in her hand. The would-be carjacker then went over to an 83-year-old man sitting in his blue Chevrolet Cavalier, pulled the elderly

---

[1] The two other arguments that Mr. Epps raises on appeal are without merit. First, the district court did not clearly err in denying Mr. Epps's motion under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). Regardless of whether Mr. Epps established a prima facie case of discrimination, the potential juror's misunderstanding of the jury questionnaire was a plausible, race-neutral basis for the government's exercise of a peremptory strike. Second, the district court did not abuse its discretion in sentencing Mr. Epps to 360 months imprisonment. The district court properly reviewed the mitigating evidence, weighed the 18 U.S.C. § 3553(a) factors, and considered the arguments of counsel when it imposed the sentence.

man out of the car and onto the pavement, and drove off.

Deputy Paul Kent was responding to the bank robbery when he heard a report about a blue Cavalier being carjacked. There were a number of police cars present when he arrived at the scene of the carjacking, so he instead proceeded across the street in the direction of a shopping mall. As he was approaching the mall, he noticed a blue Cavalier parked at an angle next to a pawnshop, with its driver's door open. He continued toward the mall, and he saw a man running quickly through the mall parking lot with a white bag in his hand. The path that the runner was taking led away from the Cavalier toward the mall entrance. Deputy Kent, who had his lights and siren going, used his car's P.A. system two or three times to announce his presence and order the individual to stop. The fleeing individual looked back over his shoulder at the police car and pointed a gun in the deputy's direction, while continuing to run. A bystander in the mall parking lot also saw the gun being pointed at the officer. At this point, the runner was approximately ten feet in front of the police car. Deputy Kent then attempted to stop the man by hitting him with the front right corner of the patrol car. The man rolled off the car's hood and landed on the ground. Both the gun and the white bag went flying, as well as another object later determined to be a pocket knife. Deputy Kent got out of his car and covered the suspect with his firearm until

3

another officer arrived and handcuffed the individual. The man arrested turned out to be Mr. Epps.

Mr. Epps was already in custody by the time Investigator Margaret Dawson arrived to process the scene. She took photographs of the gun, knife, and white bag where they came to rest on the ground near the patrol car. The white bag was a pillowcase, with pink stains on it. The pillowcase was later moved to the back of a police vehicle, where the police opened it and found the following items: currency that was partially burned and marked with red dye; two dye packs; a dreadlock wig; a black bag; a shirt; and a can of pepper spray.

Mr. Epps was taken to a nearby hospital for treatment of his abrasions. He informed the police that he wanted to speak with the lead investigator and was interviewed by FBI Agent Joseph Thompson approximately three hours after the bank robbery took place. Agent Thompson advised Mr. Epps of his rights to remain silent and to consult with an attorney. Mr. Epps signed a waiver of rights form, which was also signed by Agent Thompson and by a witness, Investigator Kevin Gaddis of the Gainesville Police Department. Mr. Epps then confessed to the bank robbery, carjackings, and attempt to flee from the police, although Mr. Epps denied pointing his gun at Deputy Kent.

After being indicted, Mr. Epps filed a motion to suppress the evidence found

in the pillowcase. Deputy Kent and Investigator Dawson testified at an evidentiary hearing. The magistrate judge subsequently recommended that the motion to suppress be denied, a recommendation that the district judge approved and adopted over Mr. Epps's objections.

Mr. Epps's jury trial began on December 8, 2008. The government's witnesses included the bank tellers, the carjacking victims, and various law enforcement officers. Agent Thompson testified about the confession that Mr. Epps gave shortly after being arrested. Investigator Gaddis was not called as a witness by either party.

During closing argument, defense counsel suggested that Agent Thompson had fabricated the confession:

> Ask yourself something: Why in the world would somebody let an agent know that, hey, I want to talk to you and then I want to give a full confession? There is no testimony about any promises. There was no testimony that he was going to get any benefit. Why in the world would he do that? That doesn't make sense. That type of thing is reason to doubt. It's reason to doubt whether that statement was given.

In rebuttal, the prosecutor told the jury, "Defense specifically argued to you there's—that what Agent Thompson testified to, he said that's not what the defendant said. I'm going to say it again: Agent Thompson wasn't the only other person in the room. There was somebody else there." Mr. Epps objected and

5

moved for a mistrial. The district court denied the motion, but instructed the jury that the defense had no burden to present any kind of evidence and that the burden of proof was entirely on the government.

The jury found Mr. Epps guilty on all counts, and the district court sentenced him to 360 months imprisonment. Mr. Epps timely appealed.

## II.

Mr. Epps contends that the district court erred in denying his motion to suppress evidence. Specifically, he argues that the police did not have authority to conduct a warrantless search of the pillowcase he was carrying. He also maintains that Deputy Kent did not have a lawful justification for stopping him, and that everything obtained from his unlawful detention must therefore be suppressed as the fruit of the poisonous tree.

"In an appeal of the district court's denial of a defendant's motion to suppress, we review the district court's findings of fact for clear error and its application of the law to those facts *de novo*." United States v. Luna-Encinas, 603 F.3d 876, 880 (11th Cir. 2010). When reviewing the denial of a motion to suppress, this Court is not restricted to the evidence presented at the suppression hearing and instead considers the whole record. United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007).

6

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. However, "only individuals who have a legitimate expectation of privacy in the area invaded may invoke the protections of the Fourth Amendment." United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009). "'The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy.'" United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006)). "'The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.'" Id. (quoting Segura-Baltazar, 448 F.3d at 1286).

Mr. Epps manifested his subjective expectation of privacy by placing personal items inside the pillowcase and holding it shut in one hand. The fact that the pillowcase could not be fastened is not dispositive. The Supreme Court has recognized that "a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case." United States v. Ross, 456 U.S. 798, 822, 102 S. Ct. 2157, 2171

7

(1982).

Where Mr. Epps's argument founders is on the objective component, because society is not willing to accept that his subjective privacy expectation was objectively reasonable. The Supreme Court has suggested in dictum that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." Arkansas v. Sanders, 442 U.S. 753, 764 n.13, 99 S. Ct. 2586, 2593 n.13 (1979), overruled on other grounds by California v. Acevedo, 500 U.S. 565, 579, 111 S. Ct. 1982, 1991 (1991).[2]

This Court, applying Sanders, has found permissible warrantless searches where the container itself and the circumstances under which the police obtained it indicate that the contents are contraband. For example, we have upheld a

---

[2] The Supreme Court held in Sanders that the automobile exception to the warrant requirement does not allow police to search luggage taken from a lawfully stopped automobile. 442 U.S. at 766, 99 S. Ct. at 2594. The Acevedo Court overruled the main holding of Sanders by deciding that "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." 500 U.S. at 580, 111 S. Ct. at 1991. "However, because Acevedo was expressly based on an application of the automobile exception, it does not alter the principle set forth in Sanders that there is no reasonable expectation of privacy in a container that discloses its contents." United States v. Huffhines, 967 F.2d 314, 319 n.5 (9th Cir. 1992). We join our sister circuits that have considered the question in concluding that "the logic of the Sanders footnote has survived." United States v. Villarreal, 963 F.2d 770, 776 n.2 (5th Cir. 1992); see also United States v. Meada, 408 F.3d 14, 23 (1st Cir. 2005); United States v. Williams, 41 F.3d 192, 196–98 (4th Cir. 1994); United States v. Banks, 514 F.3d 769, 773–74 (8th Cir. 2008); Huffhines, 967 F.2d at 319 n.5; United States v. Donnes, 947 F.2d 1430, 1437 (10th Cir. 1991); United States v. Taylor, 497 F.3d 673, 679–80 (D.C. Cir. 2007).

warrantless search of closed, opaque packages that reeked of marijuana. United

States v. Lueck, 678 F.2d 895, 903 (11th Cir. 1982). We have also upheld the

warrantless search of a paper sack lying in full view on the floor of a car, where the

paper sack was labeled as being from a pharmacy suspected of involvement in

illicit activities and the sack's "contents could be inferred from the [observing

police officers'] first hand knowledge that it had been brought directly from the

pharmacy under unusual circumstances." United States v. Sutton, 636 F.2d 96,

99–100 (5th Cir. Unit A Feb. 1981).[3] But we have found a Fourth Amendment

violation where the police conducted a warrantless search of a zippered case and

found a gun inside. United States v. Rigales, 630 F.2d 364, 368 (5th Cir. 1980).

The fact that the case contained a gun could not be inferred from its outward

appearance: although the officer testified that the case was heavy and had a bulge

in the middle, there was no evidence indicating that the bulge was in the shape of a

pistol or demonstrating that "the zippered case was anything other than an ordinary

briefcase that was simply heavy and bulging." Id.

In this case, considering the totality of the circumstances, the fact that the

pillowcase contained dye packs and possibly other items associated with the bank

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

robbery could "be inferred from [its] outward appearance." Sanders, 442 U.S. at 764 n.13, 99 S. Ct. at 2593 n.13; see also United States v. Williams, 41 F.3d 192, 197 (4th Cir. 1994) ("[T]he circumstances under which an officer finds the container may add to the apparent nature of its contents."). Deputy Kent saw Mr. Epps with a white bag in his hand, running away from a blue Cavalier parked at an angle with its driver's door open. The deputy knew that a blue Cavalier had been carjacked, and he believed that the carjacking was related to a bank robbery that had taken place in the same area just minutes before. After being directed to stop, the fleeing individual pointed a gun at the deputy. Upon closer inspection, the white bag was found to be a pillowcase with pink stains on it. Tellers frequently give bank robbers dye packs, which are designed to explode after the robbery and permanently mark the bills with ink. See United States v. King, 842 F.2d 311, 312 (11th Cir. 1988) ("Although [Officer] Morton was not aware of the . . . robbery, he knew that bank tellers frequently insert red dye bombs in packages during bank robberies."); United States v. Gidley, 527 F.2d 1345, 1348 & n.1 (5th Cir. 1976) (discussing detective's awareness that "dye stained money often is a result of the explosion of a dye bomb planted during a bank robbery," and finding it "unlikely" that "the other officers were unaware of the significance of stained money").

Because the pillowcase's contents could be inferred from its outwardly

10

visible stains and the circumstances under which the police obtained it, the pillowcase was one of those containers that "by [its] very nature cannot support any reasonable expectation of privacy." Sanders, 442 U.S. at 764 n.13, 99 S. Ct. at 2593 n.13. The pillowcase therefore fell outside the protective ambit of the Fourth Amendment, and the police did not violate Mr. Epps's constitutional rights when they opened the pillowcase without first obtaining a warrant.

Mr. Epps's other Fourth Amendment argument also fails. He contends that Deputy Kent's sole basis for seizing him was impermissible racial discrimination, and that the fruit of the poisonous tree doctrine therefore requires suppression of the gun, knife, and pillowcase seized after his unlawful detention. We are not persuaded.

It is true that "[e]vidence seized after an illegal seizure should be suppressed as the 'fruit of the poisonous tree.'" United States v. Davis, 313 F.3d 1300, 1302 (11th Cir. 2002). However, "the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." Florida v. White, 526 U.S. 559, 565, 119 S. Ct. 1555, 1559 (1999). After announcing his presence and directing Mr. Epps to stop, Deputy Kent saw Mr. Epps pointing a pistol at him from about ten feet away, which made the officer fear for his own safety. A bystander in the mall parking lot corroborated the

11

deputy's testimony about the pointing of the weapon. Deputy Kent thus had probable cause to believe that Mr. Epps had committed the felonies of aggravated assault and aggravated assault upon a peace officer. See O.C.G.A. § 16-5-21(a)(2) (defining aggravated assault as an assault "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury"); id. § 16-5-21(c) ("A person who knowingly commits the offense of aggravated assault upon a peace officer while the peace officer is engaged in, or on account of the performance of, his or her official duties shall, upon conviction thereof, be punished by imprisonment for not less than five nor more than 20 years."). The deputy's subsequent detention of Mr. Epps was a lawful warrantless seizure, which means that none of the evidence obtained from the seizure was tainted. See United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009) (holding that, because the defendant's seizure and arrest were constitutional, "neither of his subsequent statements was tainted by those events" and his "Fourth Amendment fruit of the poisonous tree argument plainly collapses"). The district court properly rejected Mr. Epps's argument that the gun, knife, and pillowcase should be suppressed as the fruits of an illegal seizure.

12

**III.**

Mr. Epps also raises a prosecutorial misconduct claim. Specifically, he argues that the government impermissibly vouched for Agent Thompson's credibility because the prosecutor suggested during closing argument that an uncalled witness could have corroborated Agent Thompson's testimony.

"The Court reviews a prosecutorial misconduct claim *de novo* because it is a mixed question of law and fact." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). "To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991). Improper vouching occurs in two different circumstances: (1) if the prosecutor "place[s] the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity," or (2) if the prosecutor "implicitly vouch[es] for the witness' veracity by indicating that information not presented to the jury supports the testimony." United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983).

Although Mr. Epps does not contend that the prosecutor expressly vouched for Agent Thompson's credibility, he maintains that the prosecutor's comment amounted to implicit vouching. We do not agree.

13

A prosecutor engages in implicit vouching when he or she relies on information not before the jury to bolster a witness's credibility.  See United States v. Hands, 184 F.3d 1322, 1333–34 (11th Cir. 1999) (finding it improper for the prosecutor to state that the wife would have echoed her husband's trial testimony, where the wife was never called as a witness); Eyster, 948 F.2d at 1207 (finding it improper for the prosecutor to suggest that inconsistencies in a key witness's testimony could be explained by a typographical error, where there was no evidence to support the prosecutor's typographical error theory).  As we stated in United States v. Martinez, 96 F.3d 473, 476 (11th Cir. 1996), "argument to the jury must be based solely on the evidence admitted at trial."

Unlike the problematic comments in Eyster and Hands, the prosecutor's statement in this case was based on information presented to the jury.  Agent Thompson testified that he and Investigator Gaddis went to the police station to interview Mr. Epps, that he introduced Investigator Gaddis to Mr. Epps, and that Investigator Gaddis signed Mr. Epps's waiver of rights form as a witness.  As nothing in the record indicates that Investigator Gaddis left in the middle of the interview, it was permissible for the prosecutor to suggest that Investigator Gaddis was present when Mr. Epps confessed.  No reversible error exists where "the Government simply [makes] explicit an inference that the jury could have drawn

14

from the evidence." United States v. Campbell, 223 F.3d 1286, 1290 (11th Cir. 2000); see also United States v. Smith, 700 F.2d 627, 633 (11th Cir. 1983) (noting that a lawyer in closing argument has the "'right to state his contention as to the conclusions that the jury should draw from the evidence'" (quoting United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978))).  Because the prosecutor made a permissible inference based on the evidence admitted at trial, the prosecutor's statement that somebody else was present during Mr. Epps's confession did not constitute improper implicit vouching.

Even if we were to assume that the comment was improper, Mr. Epps cannot satisfy the second prong of the prosecutorial misconduct test.  The remark did not prejudicially affect Mr. Epps's substantial rights, because it did not "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Eyster, 948 F.2d at 1206 (alteration in original) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)).  A denial of due process occurs when "'there is a reasonable probability that, but for the prosecutor's offending remarks, the outcome of the . . . [proceeding] would have been different.'"  Id. at 1206–07 (alteration in original) (quoting Kennedy v. Dugger, 933 F.2d 905, 914 (11th Cir. 1991)) (internal quotation marks omitted).

In this case, even setting aside any corroborating effect due to Investigator

15

Gaddis's presence during the interview, there is no reasonable probability that the jury would have returned a different verdict. Mr. Epps gave a detailed confession to Agent Thompson, which included specifics about the disguise he wore during the robbery, which bank tellers he approached, the dye packs exploding inside the pillowcase, why his first attempted carjacking failed, the circumstances of the second carjacking, his flight toward the mall, and his use of superglue on his fingers to avoid leaving fingerprints. Many of these details were corroborated by the testimony of the tellers, the carjacking victims, and Deputy Kent. There was also strong circumstantial evidence that Mr. Epps committed the bank robbery. He was seen running away from a carjacked vehicle closely linked in space and time to the robbery; ignored repeated police orders to stop; pointed a gun at a pursuing officer; and was carrying a pillowcase that contained a wig, a black bag, dye packs, and dye-stained money consistent with the materials used or taken during the robbery. In light of the evidence against him, Mr. Epps has failed to show that his substantial rights were affected by the alleged prosecutorial misconduct.

**IV.**

For the reasons described above, the district court's denial of Mr. Epps's motion to suppress, as well as Mr. Epps's convictions and sentence, are

**AFFIRMED.**

16