*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0234p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RAAHKIIM EL BEY,

 *Plaintiff-Appellant,*

 *v.*

No. 07-3133

TIM ROOP, MATT MILLER, DARRIN BARLOW, DIANE
L. BRYAN, and WILLIAM F. SCHENCK,

 *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 06-00257—Michael R. Merz, Magistrate Judge.

Submitted: June 3, 2008

Decided and Filed: July 1, 2008

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Lynnette Ballato Dinkler, SUBASHI, WILDERMUTH & DINKLER, Dayton, Ohio,
Jeffrey C. Turner, SURDYK, DOWD & TURNER CO., L.P.A., Dayton, Ohio, for Appellees.
Raahkiim El Bey, Xenia, Ohio, pro se.

_____

### OPINION

_____

 RONALD LEE GILMAN, Circuit Judge. This case arises out of the events surrounding the
entry into, and search of, a residence in Xenia, Ohio, and the subsequent arrest of Raahkiim El Bey
by Xenia police officers. El Bey claims that the officers unlawfully entered his residence,
handcuffed him, and illegally searched his belongings in an effort to verify his identity. The
officers, on the other hand, contend that the primary leaseholder of the residence consented to their
entry into the home and that El Bey was initially detained only until the officers could determine
whether he was the suspect for whom they had a valid arrest warrant. Upon discovering that there
was an outstanding arrest warrant from New Jersey for a person named Billie Greene, whose Social
Security number matched the one found in El Bey's residence, and after confirming that El Bey had
changed his name from Billie Greene, the officers arrested El Bey.

 El Bey subsequently filed a pro se complaint against the police officers pursuant to 42 U.S.C.
§ 1983 and Ohio state law. The officers moved for summary judgment, arguing, among other things,

that they were entitled to qualified immunity.  Their motion for summary judgment was granted by the magistrate judge designated to decide El Bey's case.  For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part the judgment of the district court, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.      Factual background

On a weekday afternoon in April of 2005, Deputy United States Marshals Andrea Frisby and Anthony Keffer, accompanied by Xenia police officers Matt Miller and Tim Roop, went to a residence located at 1580 Greenlake Drive.  The marshals were there, with backup assistance from Miller and Roop, because of an outstanding federal arrest warrant for a man named Donald Ray.  Ray was a fugitive who had previously given law enforcement officers the 1580 Greenlake Drive address as his primary residence.

The United States Marshals Service (USMS) in the Southern District of New York, which forwarded the request for assistance in apprehending Ray to the USMS in the Southern District of Ohio, also informed the Ohio USMS that Ray had a former girlfriend named Shakena Goode.  After Deputy Marshal Frisby discovered that Goode resided at 1580 Greenlake Drive, Frisby called the Xenia Police Department to request backup assistance from local authorities before going to the residence.  When the four law enforcement officials arrived at 1580 Greenlake Drive, Deputy Marshal Frisby and Officer Roop went to the front door, while Deputy Marshal Keffer and Officer Miller went to the back door.  Frisby described this as a "standard procedure utilized to secure a property."

The parties' versions of the events that followed differ radically.  According to the affidavits of Deputy Marshal Frisby and Officer Roop, Goode answered Frisby's knock on the door and, after Frisby displayed her badge and explained that she had a federal arrest warrant for Ray, Goode permitted Frisby and Roop to enter.  Frisby subsequently encountered El Bey, whom both marshals described in their affidavits as bearing a "striking" resemblance to the photograph of Ray that they had received from the New York USMS.  Frisby stated that El Bey identified himself as Raahkiim El Bey and that, "[c]onsistent with routine practice," she instructed Roop "to detain and handcuff Mr. El Bey until his identity was confirmed and while [Frisby] secured the house."  Roop complied.

According to Deputy Marshal Frisby, she then accompanied Goode upstairs to find El Bey's identification and to get him some clothes (he was only half dressed at the time).  Frisby said that she spoke to Goode twice about Ray outside the presence of El Bey, once while upstairs and once in the kitchen.  Goode confirmed that Ray had recently been in Xenia and indicated that she wanted to help the marshals find him.  Frisby also acknowledged that Goode told her that El Bey was not Ray.

Deputy Marshal Keffer and Officer Miller eventually came around from the back of the residence and entered through the front door.  Keffer's affidavit indicates that Goode "was cooperative with" both marshals.  In contrast, he said that El Bey "was defiant throughout his detention and attempted to stop Shakena Goode from speaking to the officers.  As a result, Shakena Goode was taken outside of his presence so that the [marshals] could speak to her without his interference."  Miller stated that after "look[ing] around to ensure that the house was secure," he accompanied Deputy Marshal Frisby and Goode upstairs "so that they could talk about the fugitive."  He likewise recalled that Goode was "cooperative at all times."

Meanwhile, Officer Roop called El Bey's name into dispatch, but no information came up.  His affidavit states as follows:

> As I paced the room, I noticed paperwork near the computer in plain view, with a sequence of numbers that appeared to be a social security number. I was not searching the premises and came upon these numbers by chance. I called the numbers into dispatch.
>
> . . . .
>
> Dispatch confirmed that the social security number belonged to Billie Greene, who had an outstanding warrant in New Jersey [that] . . . was still valid.

The only other statement from the officers regarding how El Bey's Social Security number was obtained came from Deputy Marshal Keffer, who simply said that El Bey's "social security number was located and a check of his social security number revealed that his legal name was Billie Greene and that he was wanted on a New Jersey arrest warrant."

El Bey, in stark contrast, claimed in his verified complaint that he—not Goode—answered the knock on the front door. According to El Bey, as soon as he unlocked and began to open the door, "the door was suddenly pushed open and [my] wrists were instantly grabbed and placed in handcuffs" by Officer Roop. El Bey further stated that Deputy Marshal Keffer and Officer Miller appeared instantaneously, and that Officer Roop "instructed Officer Miller to search the first floor of plaintiff's home, including such spaces as the living room closet, the bathroom, the kitchen area, and the padio [sic] area." The complaint also alleged that El Bey "continued to issue objections while informing all four intruders that they were trespassing and that all four should leave."

El Bey contends that after he identified himself to the officers and some combative words were exchanged between himself and Officer Roop (including El Bey's refusal to disclose to Roop his Social Security number), Deputy Marshal Frisby showed El Bey a "Wanted" poster of Ray. At that point, El Bey told Frisby that he was not Ray, that he did not know Ray, and that "any legal situation involving the alleged suspect did not pertain" to him in any way. He also noticed that "the physical profile of the alleged suspect . . . told of, at the least, a two inch difference in height (lesser), a fifteen pound difference in weight (greater), and a darker complexion (greater) when compared to plaintiff."

Under El Bey's version of the facts, Goode then emerged from upstairs and asked what was going on. Deputy Marshal Frisby told Goode that the officers were looking for Ray and showed her the "Wanted" poster, at which point Goode "responded that the suspect they sought did not live there, and that they should release plaintiff, and leave." Goode, after being informed that El Bey would not be released until the officers were satisfied that he was not the suspect, asked to speak to Deputy Marshal Frisby alone in the kitchen. El Bey further contends that when Frisby and Goode returned from the kitchen, Frisby spoke to Deputy Marshal Keffer, who then told El Bey that the marshals were "satisfied" that El Bey was not the suspect, "and that they were going to leave the matter at the discretion of Officer Roop and Officer Miller."

When El Bey again refused to give Officer Roop his Social Security number, El Bey claims that Officers Miller and Roop "looked toward the desk in the living room where plaintiff's computer sat and began to search it." El Bey stated that this was done without his consent, and claims that Roop opened a number of closed manila file folders "stacked on top of a green binder titled 'Charter Financial,' and began sifting through the documents inside." During the course of this unauthorized search, El Bey contends that Roop found a "plastic protector, which was not in plain view, from its place between a number of papers inside" one of the folders. Roop pulled out one of two envelopes (which had a Social Security Administration heading on it) inside the plastic protector, opened the envelope, and found a photocopy of El Bey's Social Security card.

The parties appear to agree that, at this point, the officers learned from dispatch that there was an outstanding arrest warrant in New Jersey for a man with the legal name of Billie Greene, whose Social Security number matched that of El Bey's. El Bey then confirmed that he had changed his name from Billie Greene, but contended that he was no longer wanted on the New Jersey warrant. Deputy Marshal Frisby stated that she overheard the communication between one of the officers and dispatch as she was coming downstairs, and that she "expressed to the local officers that she had no interest in arresting Mr. El Bey, as he was not Fugitive Ray." Officer Roop then arrested El Bey and took him to the Greene County Jail. El Bey was processed, taken before a judge, and held for a approximately a month (because he was unable to make bail) until the state of New Jersey determined that it would not be pursuing the weapons charge for which the warrant had issued.

## B.     Procedural background

In August of 2006, El Bey filed a pro se complaint that raised 21 separate claims for relief against the following five Xenia employees in their individual and official capacities: Officers Miller and Roop, Detective Darrin Barlow, Chief Deputy Clerk Diane L. Bryan, and William F. Schenck, the prosecuting attorney for the Xenia Municipal Court. The latter three defendants were included because of their involvement in El Bey's post-arrest booking and imprisonment. El Bey sought declaratory and injunctive relief, in addition to compensatory and punitive damages.

The complaint challenged the validity of a number of Ohio statutes relating to warrants and arrest procedures under various provisions of the U.S. Constitution. El Bey claimed that the statutes were unconstitutionally applied in violation of his rights to due process and equal protection under the Fourteenth Amendment, he raised other claims under the First, Fourth, and Fourteenth Amendments, and he asserted a number of claims under Ohio statutory and common law. He has at this point abandoned most of those claims, so that the only ones remaining on appeal are that Officers Miller and Roop violated his Fourth Amendment rights when they entered his residence, handcuffed him, searched his papers, and eventually arrested and detained him.

The parties consented to having the case adjudicated by a magistrate judge. Barlow, Bryan, Miller, and Roop eventually moved for summary judgment on the basis that they were entitled to qualified immunity. Schenck filed a separate motion, arguing that he was entitled to absolute immunity because his role as prosecutor was judicial in nature. El Bey opposed their motions by filing a verified response, and the defendants filed replies.

In December of 2006, the district court granted summary judgment in favor of all the defendants and dismissed El Bey's complaint. The court found that there were no genuine issues of material fact in dispute and that, because Goode had given the officers permission to enter the residence, El Bey's claim that the officers had unlawfully entered was without merit. Furthermore, the court concluded that the officers acted within their authority in handcuffing El Bey while they secured the residence, and that "[t]he Social Security number which was found in plain view created probable cause to believe that the Plaintiff was a person wanted on the arrest warrant." The court therefore determined that El Bey's arrest was lawful and that he had failed to state a constitutional claim. Although the defendants have argued that El Bey's appeal is untimely, this court has previously concluded that El Bey filed his Notice of Appeal well within the time limit set forth in Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

## II.  ANALYSIS

## A.     Scope of the issues raised on appeal

Despite the large number of claims that El Bey raised in his complaint, the scope of this appeal is relatively narrow. El Bey has not addressed the claims that he initially made against Barlow, Bryan, or Schenck, so we affirm the judgment of the district court insofar as it relates to

those defendants. *See Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996) (concluding that the plaintiff had "abandoned" its § 1983 claim against the county by failing to pursue its argument on appeal). This leaves before us only those claims directed towards Officers Miller and Roop that relate to their actions in entering the 1580 Greenlake Drive residence and arresting El Bey.

In his pro se brief on appeal, El Bey referred to a number of claims to be raised in a reply brief that was never filed with this court. One of those claims, relating to his *Miranda* rights, was not raised below and has therefore been waived. *See Taft Broad. Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991) ("A long line of cases in this circuit strongly reinforces the principle that issues not litigated in the trial court are generally not appropriate for appellate consideration in the first instance."). The officers devote much of their own brief to discussing two of the claims that El Bey stated that he would address in his reply brief but did not: (1) whether the "clear physical differences" between El Bey and Ray precluded a finding that the officers had probable cause to arrest El Bey, and (2) whether exigent circumstances justified El Bey's arrest.

What the officers have largely ignored, however, is El Bey's assertion that the district court improperly found that (1) Goode had consented to the officers' entry into the residence, and (2) Officer Roop had found El Bey's Social Security number in plain view. El Bey also lodged a more general request for this court to review whether "the District Court's judgment was proper," and we are mindful to construe his arguments liberally. *See Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) ("Pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings."); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (explaining that allegations in a pro se complaint are held "to less stringent standards than formal pleadings drafted by lawyers"). We will therefore proceed to consider whether the district court properly granted summary judgment in favor of Officers Miller and Roop on El Bey's constitutional claims relating to the entry into and search of his residence and his eventual arrest.

## B.     Standard of review

A district court's grant of summary judgment is reviewed de novo. *Int'l Union v. Cummins*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

In the present case, the officers claim that they are entitled to qualified immunity for their actions relating to El Bey's arrest. Qualified immunity protects government officials from liability for civil damages stemming from their performance of discretionary functions so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We generally review claims of qualified immunity using a two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

As a threshold matter, we must address whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.*; *see also Charvat v. E. Oh. Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001) ("First, the court must ask whether the plaintiff in the civil action has demonstrated the violation of a constitutionally protected right."). This requires us to "adopt[] . . . the plaintiff's version of the

facts." *Scott v. Harris*, 127 S. Ct. 1769, 1775 (2007). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

"On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*; *see Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (explaining that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201. A third consideration occasionally examined by this court to "increase the clarity" of the analysis of whether a right was clearly established is "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005) (citations omitted).

The district court determined that El Bey had failed to produce "any affidavits which contest the essential facts shown by the Defendants' Affidavits." It therefore adopted the facts as put forth by the officers. The court then concluded that there were no genuine issues of material fact in dispute and that the officers were entitled to judgment as a matter of law. On appeal, the officers have taken the identical position, reciting as the "material facts" those put forth in the affidavits attached to their motion for summary judgment.

But this view of the record fails to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746. His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (explaining that where a party files a verified complaint, the allegations contained therein "have the same force and effect as an affidavit for purposes of responding to a motion for summary judgment" (internal quotation marks omitted)); *see also Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) (concluding that a prisoner's signed complaint with a statement declaring the truth of the allegations under penalty of perjury was sufficient to place controverted facts into issue). Both the district court and the officers have thus erred in failing to view the facts in the light most favorable to El Bey, which is required at this stage of the proceedings.

## C.     Fourth Amendment claims

The Fourth Amendment provides protection against "unreasonable searches and seizures," and "the arrest of a person is quintessentially a seizure." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted). Moreover, the Supreme Court has explained that because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[,] . . . [i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 585-86 (citations and internal quotation marks omitted). Thus, unless one of the "few well-defined and carefully circumscribed circumstances" justifying a warrantless entry exists, the Fourth Amendment reasonableness standard "generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) (citing *Payton*, 445 U.S. at 585-86).

El Bey has alleged facts giving rise to two independent claims of Fourth Amendment violations. The circumstances surrounding the officers' entry into his residence form the basis of El Bey's first claim that the entry was unlawful and that he was unlawfully seized. His contention that the officers searched his papers without consent underpins his second claim of an illegal search. To determine whether the officers are entitled to qualified immunity on these claims, we must first

decide  if El Bey has raised a genuine issue of material fact as to whether his Fourth Amendment rights were violated.  We will address each of his claims in turn.

>    *1.        Deputy Marshal Frisby's and Officer Roop's entry into 1580 Greenlake Drive*

El Bey first contends that the officers unlawfully entered his residence and detained him without probable cause or exigent circumstances.  The officers respond by arguing that their entrance into El Bey's residence was justified because (1) Goode, another resident, had consented to the entry, and (2) they had a federal arrest warrant to apprehend Ray at that address.  But as the discussion in the factual background makes clear, whether Goode allowed the officers to enter 1580 Greenlake Drive is disputed by El Bey and is a genuine issue of material fact to be resolved by a factfinder.  For the purposes of summary judgment and the first prong of the qualified-immunity inquiry, we must assume the truth of the facts as set forth in El Bey's verified complaint—that Deputy Marshal Frisby and Officer Roop pushed their way into the residence as soon as El Bey unlocked and began to open the door, and that Officer Roop immediately handcuffed El Bey.

El Bey does not dispute, however, that the officers had a valid arrest warrant for Ray and that they were acting on information that Ray had listed the 1580 Greenlake Drive address as his residence.  Deputy Marshal Frisby's assertion that the officers had information that Goode was a former girlfriend of Ray's and that Goode lived at the residence in question is also uncontested.  This is not, therefore, a case in which the officers unlawfully entered and searched El Bey's home in reliance on an arrest warrant for a third party.  *See Steagald v. United States*, 451 U.S. 204, 207 (1981) (concluding that Steagald's Fourth Amendment rights had been violated where the officers were able to obtain a warrant to search his home for drugs only on the basis of observations that they had made after first entering the home to execute an arrest warrant for a nonresident third-party).

Instead, the officers' unchallenged assertion is that they believed that they were actually entering the residence of Ray, the subject of the arrest warrant.  *See United States v. Bervaldi*, 226 F.3d 1256, 1267 n.11 (11th Cir. 2000) (noting that the officers had a reasonable belief that the residence searched was the residence of the subject of the arrest warrant, "not some third party's residence as in *Steagald*," and explaining that *Steagald* was therefore inapplicable).  The question thus remains whether El Bey's Fourth Amendment rights were violated when (1) the officers entered the residence looking for Ray, and (2) Officer Roop handcuffed El Bey while determining whether El Bey was the subject of the arrest warrant and/or whether Ray was present in the home.  As discussed below, the answer to these related questions turns on the reasonableness of the officers' actions.

We note at the outset that an inconsistency exists in the record as to the marshals' precise reason for going to the 1580 Greenlake Drive residence.  On the one hand, both marshals' affidavits state that they went to the residence to "search" for Ray (and presumably to execute the arrest warrant if they found him there).  The official Report of Investigation filed by Deputy Marshal Keffer the day after the marshals' visit, however, states that they had gone to the residence "to interview" Goode about Ray.  In either case, the officers appear to have been relying on their authority under the arrest warrant for Ray when they entered the residence.  The validity of El Bey's constitutional claim is thus dependent on whether the officers had the authority to enter the residence for this purpose.

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603.  This court has elaborated on this principle, holding that "an arrest warrant is sufficient to enter a residence if the officers, by looking

at common sense factors and evaluating the totality of the circumstances, establish a reasonable belief that the subject of the arrest warrant is within the residence at that time." *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006); *see also id.* at 482 (explaining that the reasonable-belief standard is easier to satisfy than a showing of probable cause). *But see id.* at 485, 489-90 (Clay, J., concurring) (arguing that the reasonable-belief standard is the "functional equivalent of 'probable cause'").

As applied to this case, the two components to the reasonable-belief standard can be stated as follows:  the officers must have had a reasonable belief both (1) that Ray lived at the 1580 Greenlake Drive residence, and (2) that Ray was inside the residence at the time that they entered.  *See Bervaldi*, 226 F.3d at 1263 (explaining the "two-part inquiry" under *Payton* as requiring that the police have "a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at that time" (internal quotation marks omitted)).  The first prong of the standard requires that officers take steps to reasonably ensure that they are not entering the home of a third party in violation of *Steagald*.  *See Steagald*, 451 U.S. at 214-15 (holding that an arrest warrant alone does not authorize officers to enter the home of a third party and that, absent exigent circumstances or consent of the resident, officers must obtain a search warrant before entering the third party's home); *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001) (explaining that whether *Steagald* or *Payton* applies is resolved under the first prong of the *Payton* test).

Relevant to our analysis under the first prong, Deputy Marshal Frisby's affidavit states that the marshals had received information originating from the New York USMS that Ray had listed 1580 Greenlake Drive as his residence and that Goode was his former girlfriend.  This information was shared with Officers Miller and Roop before the officers arrived at the residence.  The discrepancy in the marshals' explanations for going to the residence in the first place casts some doubt on the officers' subjective belief that Ray actually lived at 1580 Greenlake Drive, particularly in light of their knowledge that Goode was a former, not a current, girlfriend.  But even without additional investigation on the part of the officers, Ray's first-hand statement that he lived at the Greenlake Drive address was likely sufficient to create an objectively reasonable belief that he resided there.  *See Tyson v. Willauer*, 289 F. Supp. 2d 190, 197 (D. Conn. 2003) (concluding that the FBI agents had a reasonable belief, "based on the information in the arrest warrant, which they had no reasonable basis to question," that the suspect lived at the address listed in the warrant); *see also Gay*, 240 F.3d at 1226-27 (holding that the officers' belief that the suspect lived at a particular residence was reasonable where they relied on a tip from an informant who personally accompanied them to the residence, and explaining that the officers' belief that the suspect lived there "need not prove true in fact"; "it is sufficient if the belief was objectively reasonable at the time of entry").

Turning now to the second prong of *Payton*, a review of the relevant caselaw indicates that law enforcement officers often rely on independent investigation and observations of the premises to determine whether a suspect is actually inside before entering.  *See, e.g.*, *Pruitt*, 458 F.3d at 483 (collecting cases in which the police were found to have a reasonable belief that the suspect was inside where the officers in the respective cases relied on (1) an informant's tip that the suspect was unemployed and liked to sleep late, (2) a telephone call to the residence confirming the suspect's presence, and (3) the sound of a television and the presence of a car in the driveway); *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999) (noting that "[d]irect surveillance or actual viewing of the suspect on the premises is not required," and explaining that the "suspect's presence may be suggested by the presence of an automobile, the time of day, the operation of lights or other electrical devices, . . . the circumstances of a suspect's employment . . . [a]nd . . . an absence of evidence the suspect is elsewhere" (citations omitted)).

There is no evidence in the record to suggest that the officers undertook such an investigation in the present case.  They did not allege, for example, that they observed any cars in the driveway

(or even that they had information about what kind of car Ray drove), saw lights on, or had other information suggesting that anyone—whether Ray, Goode, or someone else—was present at 1580 Greenlake Drive at the time that they executed the arrest warrant.

On the other hand, the caselaw makes clear that the reasonable-belief requirement is triggered only at the point when the police actually enter the home. Police officers are not precluded from knocking on the door of a residence in an effort to gather information supporting a reasonable belief that the suspect is inside. *See United States v. Kratzer*, 10 F. App'x 784, 787 (10th Cir. 2001) (affirming the district court's holding that police officers lacked a reasonable belief that the suspect was inside his residence at the time of entry in part because no one had answered the door when the officer knocked); *United States v. Merrill*, No. CR. 02-277, 2003 WL 282329, at *4 (E.D. La. Feb. 7, 2003) (unpublished) (concluding that the officers were justified in knocking on the door of the suspect's last known address and had a reasonable belief that the suspect was in the residence because it "was a logical place for them to begin their search, and no evidence was presented that would have led the police to conclude that the defendant resided elsewhere").

Another case in point is *United States v. Taylor*, 497 F.3d 673 (D.C. Cir. 2007), where the court concluded that a warrant squad from the USMS properly entered Taylor's residence even though the record was "devoid of proof the warrant squad arrived at [the residence] with the requisite reasonable belief" that Taylor actually lived there or was present at the time. *Id.* at 678. The *Taylor* court acknowledged that, in light of this lack of a reasonable belief, "the search was improper unless some additional information gathered at the scene, prior to the officers' entry into the house, supported such a reasonable belief." *Id.* In that case, the marshals developed a reasonable belief that the suspect was inside when they knocked on the door and had a brief conversation with Taylor's grandmother. The marshals identified themselves to Mrs. Taylor, and when one of them said Taylor's name, she responded: "He's in the basement." *Id.* at 679. This response, coupled with the early hour (shortly before 9 a.m.), sufficed to provide the officers with a reasonable belief and, therefore, justification to enter the residence. *Id.*

Although the officers in the present case, unlike the marshals in *Taylor*, did not engage in any conversation with El Bey before entering the residence, other common-sense factors supported a reasonable belief that the subject of the warrant might be present. Ray, unlike Taylor, had given the address as his primary residence. The officers, moreover, were acting in concert with federal marshals and knew that Ray was a fugitive from New York who might logically have sought refuge in the Ohio residence that he had listed as his home address. His fugitive status also increased the likelihood that he might be at home during business hours, whereas most people would probably be at work on a weekday afternoon. *Cf. United States v. Bervaldi*, 226 F.3d 1256, 1267 (11th Cir. 2000) (concluding that the police could reasonably assume that a suspect would be home at 6:00 a.m., and noting that "officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule" (internal quotation marks omitted)).

The key fact in this case, however, is that when the officers knocked on the door to 1580 Greenlake Drive, they saw someone whose appearance generally matched the physical description of the suspect for whom they were looking. Thus, the question of whether the officers had a reasonable belief that Ray was present at the residence is intertwined with the question of whether it was reasonable for the officers to mistake El Bey for Ray. *See White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("The arrest of a person named in a valid warrant, . . . even if it turns out to be the wrong individual, will not violate the Fourth Amendment *unless the arresting officer acted unreasonably*." (emphasis added)). We must therefore consider whether, in the light most favorable to El Bey, the officers formed a reasonable belief that El Bey was Ray upon seeing El Bey open the door. If so, then the officers had a reasonable basis to believe that Ray was inside the residence.

El Bey argues that "the clear physical differences" between himself and Ray render unreasonable the officers' assertion that they believed El Bey was Ray. But the record makes clear that there were substantial similarities in the two mens' appearances. Specifically, El Bey and Ray were men of the same race (African American) and similar height (5 feet 10.5 inches versus 5 feet 9 inches) and weight (160 pounds versus 176 pounds). These similarities support the conclusion that the officers reasonably believed that El Bey was the subject of the arrest warrant. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001) (acknowledging that officers must often make "split-second judgments" and that courts determining the reasonableness of their actions must refrain from substituting "the 20/20 vision of hindsight in favor of deference to the judgment of reasonable officers on the scene" (internal quotation marks omitted)); *Bervaldi*, 226 F.3d at 1266 ("Determinations of reasonable belief are based on the facts and circumstances within the knowledge of the law enforcement agents." (internal quotation marks omitted)).

We conclude, based on this evidence, that the officers on the scene did not act unreasonably in mistaking El Bey for Ray when El Bey answered their knock on the door. The officers actions, as alleged by El Bey, leave little doubt that they could have acted with more care in determining whether the person who answered the door was actually the subject of the arrest warrant. Nevertheless, we conclude that the officers—who already had reason to believe that Ray would be at 1580 Greenlake Drive—formed a reasonable, albeit mistaken, belief that El Bey was the subject of the arrest warrant in question.

Even after viewing the facts in the light most favorable to El Bey, the officers were therefore justified in entering the residence to execute the arrest warrant, and they did not violate El Bey's constitutional rights when they handcuffed him until they could determine whether or not he was the subject of the valid warrant that they possessed. *See Hill v. California*, 401 U.S. 797, 802 (1971) (concluding that the officers acted reasonably in arresting a person who was in the apartment and fit the general description of a suspect for whom they had probable cause to arrest, and affirming the principle that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest" (alteration in original) (internal quotation marks omitted)). The officers are therefore entitled to qualified immunity on this claim. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### 2.          *Officer Roop's discovery of El Bey's Social Security number*

Based on the above analysis, we have no doubt that if the officers reasonably believed that El Bey was Ray, they could have arrested him without violating his Fourth Amendment rights. *See White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) (holding that an officer did not commit a constitutional violation by arresting the plaintiff, who shared the same name, race, county of residence, birth date, and approximate weight as the subject of the arrest warrant, and explaining that "the peril of liability under section 1983 should not be placed upon arresting officers every time they are faced with the practical dilemma of arresting or releasing an individual who, despite some discrepancies in description, they reasonably believe to be the intended subject of an arrest warrant" (internal quotation marks omitted)). The problem in this case, however, is that the officers chose not to rest on their mistaken belief that El Bey was Ray. Instead, according to El Bey's version of the facts, Officer Roop conducted a warrantless search of El Bey's papers in order to find El Bey's Social Security number and verify his identity. We also note that although the officers contend that only Officer Roop is implicated in the allegations relating to the search of the residence, El Bey claims that both Officers Miller and Roop participated in the unlawful search of his papers.

Warrantless searches within the home, as previously noted, are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). "Generally, the government may not search an

individual's home without the individual's consent or a search warrant supported by probable cause." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) ("The Fourth Amendment prohibition against entering a home without a warrant applies equally whether the police enter a home to conduct a search or seizure or for some other purpose."). This holds true even if the officers reasonably believed that they had seized Ray when they entered the residence, because once the subject of an arrest warrant is found within a home, "the arrest warrant does not justify a more intrusive search of the premises." *Stover*, 474 F.3d at 911.

Alternatively, the officers' warrantless search might be reasonable under the Fourth Amendment if supported by some independent exception to the warrant requirement. One such exception "authoriz[es] officers making arrests in the home to conduct a 'protective sweep'—a 'quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers and others.'" *Id.* (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)).

The record in the present case indicates that the officers did conduct a protective sweep of the residence, but given that El Bey has not challenged that aspect of the officers' actions, we have no need to analyze whether such a search was justified under the circumstances. In any event, the alleged search of El Bey's papers could not possibly fall within this exception to the warrant requirement, which permits officers to secure only those "spaces immediately adjoining the place of arrest from which an attack could be immediately launched" and, sometimes, to search more extensively if they reasonably believe "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

But Officer Roop claims that he saw El Bey's Social Security number on a piece of paper within plain view, and that his actions therefore fall within another well-established exception to the warrant requirement. "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

There are, however, at least two problems with the officers' reliance on the plain-view doctrine to justify the seizure of El Bey's Social Security number. First, we doubt that El Bey's Social Security number was an object whose "incriminating character" was so "immediately apparent" that the officers had "a lawful right of access to it." Officer Roop correctly recognized that El Bey's Social Security number would permit him to verify El Bey's identity by calling the number into dispatch. But that does not necessarily lead to the conclusion that he was justified in seizing the number, which—far from being inherently incriminating in nature—is an item that is "intrinsically innocent." *See United States v. McLevain*, 310 F.3d 434, 441-42 (6th Cir. 2002) (explaining that one factor to consider in determining if the criminality of a piece of evidence is "immediately apparent" is whether "the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity" (internal quotation marks omitted)).

The second problem with the officers' reliance on the plain-view doctrine is its inapplicability to the present case. According to El Bey, by the time that the officers searched El Bey's papers, they had already determined that he was not Ray. There is no evidence in the record, moreover, suggesting that El Bey posed a threat to the officers' safety (indeed, the officers concede that he was handcuffed at this point), nor any indication whatsoever that before calling dispatch with the Social Security number, the officers had probable cause to believe that El Bey had committed or was committing a crime. The officers therefore had no further reason to determine El Bey's identity at all. *Cf. Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (concluding that

once the officers "knew or reasonably should have known that" they had mistakenly searched a residence other than the one listed in the search warrant, they "were obligated to retreat" (citing *Maryland v. Garrison*, 480 U.S. 79 (1986)).

More fundamentally, however, the plain-view exception to the warrant requirement is inapplicable in the present case because a genuine issue of material fact exists as to whether the Social Security number was found in plain view or not. El Bey alleges, and we must assume, that the officers found El Bey's Social Security number only by searching through the papers on his desk. That allegation forecloses the conclusion that the search was justified by the plain-view exception to the warrant requirement. Indeed, El Bey's assertions actually lead to the opposite conclusion—that the search, when viewed in light most favorable to El Bey, violated his rights under the Fourth Amendment. *See Brindley v. Best*, 192 F.3d 525, 534 (6th Cir. 1999) (reversing a grant of qualified immunity where the district court had ignored evidence in the record that called into question whether the plain-view doctrine justified a seizure of jewelry at a business).

Having determined that the facts as alleged by El Bey raise a genuine issue of material fact as to whether the officers committed a constitutional violation, we have little trouble concluding that the second prong of the qualified-immunity analysis—whether the specific right in question was clearly established at the time of the alleged violation—is also met in the instant case. The Fourth Amendment right to be free from warrantless searches within the home is clearly established. Reasonable officers presented with the circumstances as alleged by El Bey should have known that a warrantless search of El Bey's home, and an arrest based on an outstanding warrant that was discovered only as a result of the warrantless search, would be unconstitutional. *See, e.g.*, *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 550 (6th Cir. 2003) (concluding that the officers who conducted a warrantless search within a residence were not entitled to qualified immunity based on their reliance on the plain-view exception to the warrant requirement because "it was . . . clearly established that the plain view exception cannot serve to justify an otherwise unconstitutional search"); *Pray*, 49 F.3d at 1159 ("[A]ny search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity. A 'reasonable' officer would know that such warrantless searches and seizures would violate the plaintiffs' constitutional rights."). We therefore conclude that the officers' defense of qualified immunity on this claim cannot be resolved as a matter of law.

### III. CONCLUSION

For the various reasons set forth above, we **AFFIRM** all aspects of the judgment other than the portion granting Officers Miller and Roop qualified immunity in connection with El Bey's arrest and detention following the officers' search for and seizure of his Social Security number, **REVERSE** the grant of qualified immunity as to that claim, and **REMAND** the case for further proceedings consistent with this opinion.