NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0421n.06

Case Nos. 20-1003/1222

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

NELDA KELLOM, Individually and as Personal Representative of the Estate of TERRANCE KELLOM, Deceased; LAWANDA KELLOM, TERRELL KELLOM, KEVIN KELLOM, and TERIA KELLOM, Individually; JANAY WILLIAMS, as personal representative of Terrance Kellom's two minor children, son, T.D.K., and daughter, T.D.K.,

  Plaintiffs-Appellants,

v.

MITCHELL QUINN, Immigration and Customs Enforcement Agent; UNITED STATES OF AMERICA,

  Defendants-Appellees (20-1003/1222),

DARELL FITZGERALD and TREVA EATON, individually and in their official capacities as Detroit Police Officers; CITY OF DETROIT, MICHIGAN; JAMES E. CRAIG, in his official capacity, jointly and severally,

  Defendants-Appellees (20-1003).
.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Sep 03, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: SILER, MOORE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. This case involves the fatal shooting of Terrance Kellom during an attempted arrest. A jury decided that the shooting was justified. But Kellom's estate and family

now challenge various pre-trial rulings by the district court, plus evidentiary rulings at trial. We affirm in part, reverse in part, and remand some issues to the district court.

I.

Terrance Kellom had outstanding arrest warrants for armed robbery and unlawful possession of a firearm. So law enforcement deployed a federal task force to find him. As part of their search, task force members visited the home of Kellom's girlfriend. She told them that Kellom had recently shattered her car windows with a hammer and threatened to burn down her house. She also told police that Kellom was living at his father's house and described his car.

Officer Treva Eaton, a Detroit police officer and member of the federal task force, went to Kellom's father's house to conduct surveillance. She observed Kellom's car in the driveway and watched him come in and out of the house. Having located Kellom, the task force set up outside the house to arrest him.

Officer Darell Fitzgerald, another Detroit police officer on the federal task force, knocked on the front door. When Kellom's father answered, Fitzgerald explained that Kellom had outstanding warrants and that police were there to make an arrest. Fitzgerald continued to speak with Kellom's father while other officers began searching for Kellom inside the home. A task force member found Kellom in the upstairs attic, identified himself as law enforcement, and ordered Kellom to show his hands. Kellom did not comply. Instead, he warned the officer that he had a gun and that the police would "have to kill [him]." R. 234, Pg. ID 5296. The officer radioed for backup.

Agent Mitchell Quinn, an Immigration and Customs Enforcement officer and a third member of the federal task force, heard the call for assistance and entered the home. Meanwhile, officers upstairs observed Kellom attempting to escape through the attic's floor with a hammer.

Quinn positioned himself in a first-floor hallway beneath the attic where he thought Kellom would land. When Kellom eventually breached the attic's floor, he fell into a bedroom off the hallway near Quinn. Quinn heard the fall, but his view inside the bedroom was obstructed. So he drew his service pistol and began stepping backward.

Moments later, Kellom exited the bedroom with the hammer raised above his head and started towards Quinn. Quinn fired once, hitting Kellom, but Kellom continued to advance. Quinn tripped while stepping back, firing several more shots as he fell, and Kellom collapsed forward onto the floor. Kellom died from his injuries.

Kellom's estate and family sued. Their complaint raised four counts: (1) a *Bivens* claim against Quinn, Eaton, and Fitzgerald for excessive force in violation of the Fourth Amendment;[1] (2) a federal civil rights claim against Eaton and Fitzgerald for excessive force in violation of the Fourteenth Amendment; (3) a federal civil rights conspiracy claim against Quinn, Eaton, and Fitzgerald alleging a cover-up of the events leading to Kellom's death; and (4) a state-law tort claim for wrongful death against Quinn, Eaton, and Fitzgerald.

About three weeks after filing the complaint, the Estate filed an administrative claim for damages with the federal agency in charge of the task force. The agency denied the claim.

After the administrative claim was denied, the Estate amended its complaint. The amended complaint added Kellom's father and other family members as plaintiffs and raised some new claims. Among other changes, the amended complaint added a state-law claim for intentional infliction of emotional distress against Eaton, Fitzgerald, and the United States, a state-law wrongful death claim against the United States, and a Fourth Amendment claim for unlawful

---

[1]*See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

search.  The plaintiffs also raised a municipal liability claim against the City of Detroit and various Detroit officers.

The district court dismissed every claim before trial except the excessive force claim against Quinn.  A jury found that Quinn's actions were justified.  Now on appeal, the plaintiffs challenge the district court's dismissal of some claims.  They also challenge various evidentiary rulings at trial.  We address each issue in turn.

II.

*FTCA Claims.*  We review de novo the district court's dismissal of the plaintiffs' tort claims for lack of jurisdiction.  *Jackson v. United States*, 751 F.3d 712, 716 (6th Cir. 2014).

Under the doctrine of sovereign immunity, courts lack jurisdiction to hear claims for damages against the United States.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  The only exception is where the government specifically consents to suit by waiving sovereign immunity.  The government did just that when it passed the Federal Tort Claims Act (FTCA), which waives the government's immunity from certain state-law tort claims.  *See* 28 U.S.C. § 1346(b).

But there's a catch.  Before plaintiffs can sue a federal employee, the FTCA requires them to exhaust administrative remedies.  *See McNeil v. United States*, 508 U.S. 106, 112 (1993).  That means plaintiffs must first present their damages claim to the relevant governmental agency and pursue that claim until the agency renders a final decision.  28 U.S.C. § 2675(a).  If the agency doesn't resolve the claim to the party's satisfaction within six months, the plaintiffs can bring a lawsuit.  *Id.*

Not all plaintiffs must follow this rule:  The exhaustion requirement applies only to suits against a federal employee acting within the scope of her employment.  If a federal employee

commits a tort *outside* the scope of her employment, she is no different than any other defendant and a plaintiff can sue the employee without going to her agency first.

The problem for plaintiffs is that it's not always clear whether a defendant is a federal employee, and if she is, whether the tort occurred within the scope of her employment. So how does a plaintiff know to exhaust?

As an initial matter, plaintiffs must always exhaust if they allege in their complaint that a defendant is a federal employee acting within the scope of her employment. For all other plaintiffs, the Westfall Act provides some guidance. Under the Westfall Act, the Attorney General can certify that a defendant was a federal employee acting within the scope of her employment. That makes the FTCA the exclusive remedy for the torts that occurred, and it shields the employee from personal liability. It also puts the plaintiffs on notice that they must exhaust administrative remedies before filing a lawsuit.

What if the Attorney General certifies *after* the plaintiffs have already filed suit? Under the FTCA and the Westfall Act, the court must dismiss the case against the employees. And the plaintiffs can try again by suing the United States after exhausting. But the plaintiffs' second attempt must "institute" an "action." 28 U.S.C. § 2675(a).

The plaintiffs here allege that Quinn, Eaton, and Fitzgerald committed torts in the scope of their federal employment. Thus, under the FTCA, the plaintiffs had to exhaust their administrative claims before filing a lawsuit. But the plaintiffs filed suit first. So the district court dismissed the plaintiffs' FTCA claims for lack of jurisdiction.

Under long-standing Sixth Circuit precedent, that made sense: We've previously held that the FTCA's exhaustion requirement is jurisdictional. *See Exec. Jet Aviation, Inc. v. United States*, 507 F.2d 508, 514–15 (6th Cir. 1974). But while this appeal was pending, the Sixth Circuit

changed course and held that failure to exhaust under the FTCA does *not* deprive a court of jurisdiction. *Copen v. United States*, 3 F.4th 875 (6th Cir. 2021). To be sure, *Copen* dealt with a different aspect of the FTCA's exhaustion requirement. The court in *Copen* considered the FTCA's requirement that a plaintiff specify the dollar amount he seeks to recover in his administrative claim, while the plaintiffs here failed to make any administrative claim at all before filing suit. *Compare* 28 U.S.C. § 2675(b), *with id.* § 2675(a). But *Copen*'s reasoning is still instructive. In *Copen*, we followed the Supreme Court's instruction to look for a clear statement by Congress before treating a statutory requirement as a jurisdictional rule. 3 F.4th at 880–81 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006)). The FTCA's dollar-amount requirement does not explicitly limit our jurisdiction. So we held that failure to satisfy it does not deprive us of jurisdiction. *Id.* at 882.

The same is true here. The FTCA's provision requiring plaintiffs to first file an administrative claim does not say anything about a court's jurisdiction. So consistent with *Copen*, failure to satisfy that requirement does not deprive a court of jurisdiction.

Because the exhaustion requirement is not jurisdictional, the procedural history in this case matters. When the United States moved for summary judgment based on lack of jurisdiction, the plaintiffs responded that the government's motion was untimely. Of course, that wouldn't matter if the failure to institute a new action had deprived the court of jurisdiction. Jurisdictional rules limit a court's power to hear a case, and they cannot be forfeited or waived. So a party can seek dismissal for jurisdictional defects at any point in the litigation. But claim-processing rules like this one are not jurisdictional and don't always mandate dismissal. *See Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Moreover, the government's motion was filed after the Estate had exhausted its administrative remedies and had filed an unopposed amended complaint. Thus, if

the government's motion was truly too late, that could have consequences. We will leave it for the district court to decide in the first instance whether to excuse any delay and whether the amended complaint filed post-exhaustion cures any defect.

*Municipal Liability Claim.* The plaintiffs next claim that the City of Detroit and its police chief (in his official capacity) violated Kellom's federal rights by, among other things, failing to properly train and supervise their officers. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). To make out a claim for municipal liability, a plaintiff must show "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen." *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014) (citation omitted). Here, the plaintiffs' municipal liability claim fails at step two: Kellom died during a federal law enforcement operation, so the individual defendants acted under color of *federal*, not state, law. *See Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013). Since the plaintiffs failed to show a necessary element of their municipal liability claim, we affirm summary judgment on that claim.

*Fourth Amendment Claim.* We next consider the plaintiffs' claim that Quinn, Eaton, and Fitzgerald violated the Fourth Amendment by entering their home to arrest Kellom without a search warrant or consent. The district court disagreed and granted summary judgment for the defendants. We affirm.

When police have an arrest warrant, they may enter a home upon reasonable belief that (1) it is the residence of the subject of the arrest warrant, and (2) the subject is present. *El Bey v. Roop*, 530 F.3d 407, 416 (6th Cir. 2008). That rule applies even if someone else owns the home. *Id.* at 415–16. So long as police reasonably believe that the suspect lives there and is present, an arrest warrant will suffice. Thus, to avoid summary judgment, the plaintiffs must point to evidence

that would allow a jury to conclude that Quinn, Eaton, and Fitzgerald did not reasonably believe that Kellom lived in his father's home or was present when they entered to make the arrest. *See id.* at 418–19.

The plaintiffs haven't done that. Instead, they point to evidence that the task force visited two other homes before they eventually found Kellom at his father's house. But that does nothing to raise a fact dispute over whether police reasonably believed Kellom lived there. The first place the task force looked was the residence Kellom listed on his prison records. When they didn't find him there, the task force went to Kellom's girlfriend's house. She told police that Kellom was living at his father's house and provided a detailed description of his car. The task force then surveilled his father's house, saw Kellom's car, and observed Kellom coming in and out of the house. That's enough for the police to form a reasonable belief that Kellom lived there and was there when they entered. *See, e.g.*, *Harris v. Smith*, 390 F. App'x 577, 579 (7th Cir. 2010) (finding reasonable belief on similar facts). And the plaintiffs cite no evidence, and make no argument, for why a jury might see it differently in this case. Thus, the district court did not err in granting summary judgment on the plaintiffs' Fourth Amendment claim.

*Evidentiary Rulings.* Finally, the plaintiffs challenge several evidentiary rulings from Quinn's excessive-force trial. We review these evidentiary rulings for abuse of discretion. *See Frye v. CSX Transp., Inc.*, 933 F.3d 591, 598 (6th Cir. 2019).

We start by laying out the pertinent rules of evidence. First, testimony that recounts another person's out-of-court statements is excludable on hearsay grounds if it is offered to prove that the out-of-court statements are true. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 378 (6th Cir. 2009). But that testimony is admissible if offered for a different purpose—for example, to show the effect of the statements on the listener. *Id.* at 379. Second, testimony is irrelevant, and thus

excludable, if it lacks "the slightest probative worth" in resolving the case. *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (cleaned up). Third, relevant testimony may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." *Id.* (cleaned up). And finally, relevant testimony that is "needlessly cumulative" may be excluded. *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014).

The plaintiffs here contest the district court's decisions: (1) to allow task force members to recount statements by Kellom's girlfriend that Kellom had recently acted violently and threatened future violent acts; (2) to allow task force members to testify to the facts underlying Kellom's arrest warrants; and (3) to limit the plaintiffs' counsel's cross-examination of Quinn. Their arguments are unavailing.

Start with the testimony concerning Kellom's girlfriend. The plaintiffs argue that the district court should have excluded as hearsay all testimony by task force members relaying statements made by Kellom's girlfriend. But as the trial judge explained, that testimony was not offered to prove that what Kellom's girlfriend said was true—namely, that Kellom had recently destroyed her car and threatened to burn down her house. Instead, that testimony was offered to show the effect on the task force members: Leading up to the attempted arrest, the task force members believed Kellom had recently engaged in violent behavior. That is a proper, non-hearsay purpose. So the district court did not abuse its discretion by allowing the testimony.

Nor did it err by rejecting the plaintiffs' relevancy objection to that same testimony. The jury's task was to determine whether Quinn's actions were objectively reasonable under all of the circumstances surrounding his use of force. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Information that Kellom had recently engaged in violent behavior would inform a reasonable officer standing in Quinn's shoes on whether and how much force was necessary. And though

other task force members also testified to Kellom's girlfriend's statements, their testimony could help the jury decide whether Quinn's actions were reasonable because these officers told Quinn what they learned prior to the shooting. And their testimony is also relevant for a second reason: It corroborated Quinn's account. *See United States v. Flores*, 488 F. App'x 68, 71 (6th Cir. 2012). Allowing the testimony for those purposes was not an abuse of discretion.

For their part, the plaintiffs respond that even if the task force members' testimony was relevant to Quinn's state of mind, and thus admissible, the testimony was still needlessly cumulative. We disagree. Just because multiple witnesses testify to the same facts does not make the testimony impermissibly cumulative. *Ayers*, 773 F.3d at 169–70. Rather, the plaintiffs must establish that the duplicative evidence confused or misled the jury or otherwise adversely affected their case. *See id.* They didn't, so we defer to the district court's ruling.

The plaintiffs next attack the district court's decision to allow task force members to testify to the facts underlying Kellom's arrest warrants. They claim that testimony is unfairly prejudicial and impermissible character evidence. But that misunderstands character evidence. Evidence of prior bad acts is excludable as character evidence only if it is used to show that a person acted in accord with his criminal past. Fed. R. Evid. 404(a)(1), (b)(1). Here, Quinn's defense offered that testimony for a different purpose: To explain the basis of the arrest warrant and to show what a reasonable officer would have known going into the operation to arrest Kellom. So the district court did not err in allowing the testimony.

One evidentiary challenge remains. The plaintiffs argue that the district court erred by stopping plaintiffs' counsel from asking Quinn if he thought Kellom was attempting to escape when Quinn fired the fatal shots. The district court excluded the question since plaintiffs' counsel had asked, and received answers to, that line of questioning "four and five times." R. 235, Pg. ID

5502–05. The district court's decision was within its discretion. District courts have broad authority to conduct trials in a way that ensures fairness to both sides. And that includes the authority to stop lawyers from repeatedly asking the same question. We will not disturb the district court's decision on appeal.

*Sanctions Order*. Finally, the plaintiffs contend that the district court erred by sanctioning their attorney for violating a protective order. We review a district court's imposition of sanctions for an abuse of discretion. *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 721 (6th Cir. 1996).

At the outset of this case, the parties drafted and stipulated to a protective order limiting the public dissemination of discovery materials and other related records. The scope of the protective order is broad. It governs the "production and disclosure of any documents, electronically stored information, materials, things, discovery material (including responses to interrogatories, depositions, and requests to admit), materials filed with the Court, or testimony in this action." R. 29, Pg. ID 232. The order states that the parties "shall not disclose" covered information "to any person unless the disclosure is reasonably and in good faith calculated to aid in the preparation and/or prosecution of this case." *Id.*, Pg. ID 233.

After entry of the protective order, the plaintiffs' attorney disclosed discovery materials to the public on two occasions. First, he participated in a televised interview where he described the contents of Fitzgerald's deposition and provided photographs and other documents to reporters.[2] Second, he held a press conference where he discussed and criticized the deposition testimony of another officer involved in Kellom's case.

---

[2] When the district court asked the plaintiffs' counsel whether he disclosed the documents, counsel said that he did not know. The district court did not find that response credible. *See* R. 127, Pg. ID 3062 n.1.

The district court concluded these disclosures violated the protective order and ordered the plaintiffs' attorney to pay $2,000 as a sanction. In reviewing that ruling, we must determine whether the material disclosed by the plaintiffs' attorney is covered by the protective order.

The protective order is not a model of clarity. For example, paragraph 5 states that "*[a]ny discovery materials disclosed to plaintiff under this order shall be used only to prepare for and to prosecute this action.*" R. 29, Pg. ID 234 (emphasis added). Yet paragraph 6 states that "[a] disclosing party shall only designate records as subject to this order that the disclosing party reasonably believes warrant such treatment . . . ." *Id.* So it's not clear whether the parties agreed to restrict the dissemination of materials that were not specifically designated. What is clear, however, is that designated materials may not be disclosed. But from the record, we cannot determine if the sanctions were imposed because the attorney disclosed designated materials. If he did, sanctions are appropriate. If not, the district court must answer the harder question: whether the best reading of the protective order bars disclosure of materials not specifically designated under paragraph 6. Thus, we vacate the district court's sanctions order and remand for fact-finding on the nature of the materials the plaintiffs' attorney disclosed and such further proceedings as are appropriate.

## III.

Having considered the plaintiffs' many objections to the district court's rulings, we remand the FTCA claims, affirm in part, and vacate the sanctions order.